No. 23-4104

In the

UNITED STATES COURT OF APPEALS

for the

TENTH CIRCUIT

FREE SPEECH COALITION, INC.; D.S. DAWSON; JOHN DOE;
DEEP CONNECTION TECHNOLOGIES, INC.; CHARYN PFEUFFER; and
JFF PUBLICATIONS, LLC,

*Plaintiffs-Appellants,*

v.

JESS L. ANDERSON, in his official capacity as THE COMMISSIONER
OF THE UTAH DEPARTMENT OF PUBLIC SAFETY; and
SEAN D. REYES, in his official capacity as THE ATTORNEY GENERAL
OF THE STATE OF UTAH,

*Defendants-Appellees.*

Appeal from the United States District Court for the District of Utah
No. 2:23-cv-00287-District Judge Ted Stewart

**PLAINTIFFS-APPELLANTS' PETITITON
FOR REHEARING *EN BANC***

| D. Gill Sperlein | Jerome Mooney | Jeffrey Keith Sandman |
|---|---|---|
| Law Offices of D. Gill Sperlein | Weston, Garrou & Mooney | Webb Daniel Friedlander LLP |
| 345 Grove Street | 50 West Broadway, #300 | 5208 Magazine St Ste 364 |
| San Francisco, CA 94102 | Salt Lake City, UT 84101 | New Orleans, LA 70115 |
| (415) 404-6616 | 801-364-5635 | (978) 886-0639 |
| gill@sperleinlaw.com | jerrym@mooneylaw.com | jeff.sandman@webbdaniel.law |

Attorneys for *Plaintiffs-Appellants*

## TABLE OF CONTENTS

RULE 35 STATEMENT AND INTRODUCTION......................................1

STATEMENT OF THE CASE...................................................3

REASONS FOR GRANTING REHEARING EN BANC........................5

   A.    The Decision conflicts with recent Supreme Court precedent. ...6

   B.    The Decision conflicts with a seminal precedent of this Court. ..9

   C.    The Decision involves a question of exceptional importance

       calling for clarity from the full Court. ...........................................11

CONCLUSION........................................................................15

# TABLE OF AUTHORITIES

### C<small>ASES</small>

*Ashcroft v. ACLU*, 542 U.S. 656 (2004)....................................................................1

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. ___ (2022) .................6

*Ex parte Young*, 209 U.S. 123 (1908) ...........................................................passim

*Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263 (5th Cir.), *cert. granted,* 144 S. Ct.
    2714 (2024) ......................................................................................................1

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) ...................6

*Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818 (10th Cir. 2007)....9, 11

### S<small>TATUTES</small>

Utah Code § 53-3-103 ...............................................................................................4

Utah Code § 53-3-235 ...............................................................................................4

Utah Code § 78B-3-1001 and 1002...........................................................................1

### O<small>THER</small> A<small>UTHORITIES</small>

Richard H. Fallon, Jr., Constitutional Remedies: In One Era and Out the Other, 136
    H<small>ARV</small>. L. R<small>EV</small>. 1300 (2023) ............................................................................15

## RULE 35 STATEMENT AND INTRODUCTION

This appeal concerns the scope of the *Ex parte Young* exception to a state's sovereign immunity when a state official, lacking the power to ensure compliance with the law being challenged, nevertheless gives it effect by administering the only state program that provides the law its veneer of constitutionality. *Ex parte Young*, 209 U.S. 123(1908)

In March of its 2023 General Session, the Utah Legislature enacted SB287 (Utah Code §§ 78B-3-1001 and 1002-02—the "Verification Act" or "Act"), which placed substantial burdens on Plaintiff website operators, content creators, and countless others who use the internet by requiring websites to perform "reasonable age verification methods" of every user before granting digital access to non-obscene material that meets the Act's murky definition of "material harmful to minors." The Supreme Court invalidated a nearly identical law two decades ago[1] and appears poised to reaffirm its holding later this Term[2] following its grant of certiorari from an appeal that challenged the vitality of that precedent. But *this* case does not yet concern those underlying merits because the Utah Legislature, and a dozen

---

[1] *See Ashcroft v. ACLU*, 542 U.S. 656 (2004).

[2] *See Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263 (5th Cir.), *cert. granted,* 144 S. Ct. 2714 (2024).

other states that have followed its lead, has attempted to shield the Verification Act from challenge by removing the most obvious state actors from its enforcement— instead empowering private citizens to sue noncompliant websites for damages and thereby do the State's bidding in chilling access to disfavored but constitutionally protected material.

Plaintiffs challenged the Act's constitutionality shortly after it took effect, naming the Attorney General ("AG") and the Commissioner of the Utah Department of Public Safety ("Commissioner") as Defendants. They alleged that both officials bore the requisite connection to the Act's enforcement and that the constitutional injuries suffered were properly traced to those officials and redressed by relief that the district court was competent to fashion. The district court disagreed and granted the Defendants' motion to dismiss, relegating most Plaintiffs to an enforcement purgatory where they must wait to be sued in state court for the opportunity to assert their constitutional claims as defenses there, and leaving one *non-regulated* Plaintiff with no recourse whatsoever.

Plaintiffs appealed from that dismissal, and a split panel of this Court affirmed in a published decision released on October 1, 2024 ("Decision"). With respect to claims against the AG, the panel was unanimous. But with respect to claims against the Commissioner, the Decision is joined by a 21-page dissent

("Dissent") from Judge Phillips contending that the Commissioner bore a sufficient connection to the Act's enforcement to fit within the *Ex parte Young* exception.

Pursuant to FRAP 35 and 40 and the Rules of this Court, Plaintiffs-Appellants now seek rehearing en banc <u>only</u> as to that portion of the Decision that concerned the Commissioner and generated a persuasive Dissent from Judge Phillips. En banc review is justified for three reasons, as the Decision (1) conflicts with recent Supreme Court precedent, (2) conflicts with prior decisions of this Court, and (3) involves a question of exceptional importance that is all but begging for clarity—namely, whether a state official who lacks the power to ensure compliance with a challenged law nevertheless "gives effect" to it by administering the one and only state program that provides the law its veneer of constitutionality. And here, that answer is yes: Because the Verification Act imposes a constitutionally-infirm prior restraint on protected speech while leaving administration of that restraint to an agency head who has failed to provide the adequate and legislatively-prescribed channels for that speech, the *Ex parte Young* exception should apply, and Plaintiffs' pre-enforcement challenge should proceed.

## STATEMENT OF THE CASE

Plaintiffs are a collection of non-profits, for-profits, and individuals who rely on the internet for communication, both as providers and recipients of First Amendment-protected materials. To challenge the constitutionality of the Act, they

sued the Commissioner of the Utah Department of Public Safety and the Utah At-

torney General, moving for a preliminary injunction immediately upon initiating

the case. Contemporaneous with the preliminary injunction briefing, Defendants

moved to dismiss the complaint for lack of subject matter jurisdiction based on

what they asserted to be (1) Defendants' insufficient "connection to the enforce-

ment" of the challenged law under *Ex parte Young*, and (2) Plaintiffs' failure to es-

tablish a live case or controversy sufficient to satisfy Article III.

Plaintiffs opposed the motion, identifying the respective connections be-

tween the Defendants and enforcement of the statutory scheme. For the Commis-

sioner, that nexus came via his administration of Utah's Driver License Division

(DLD), *see* Utah Code § 53-3-103, which manages its Mobile Driver's License

(mDL) Program[3] that provides the State's only "digitized identification card." *See*

Utah Code § 78B-3-1001(2). When used to verify a user's age, that digital proof-

of-identity is the only State-guaranteed "reasonable age verification method" au-

thorized by the Verification Act, but the mDL Program does not yet provide for the

---

[3] *See* Utah Code § 53-3-235 (requiring DLD to "establish a process and system for an individual to obtain an electronic license certificate or identification card"). Details of the resulting mDL program are available on the DPS website. *See* Website: Utah Dept. of Public Safety, "Utah mDL FAQs," *available at*: https://dld.utah.gov/mdlfaqs/.

*online* verification that is both clearly contemplated by the Act and necessary for the card to be of any use to putative providers and viewers of "material harmful to minors" online. Other qualifying methods—to the extent they exist at all[4]—are supplied by private parties without restriction as to *whom* they must serve, *how* they must do so, or *how much* they may charge for their services.

The district court granted Defendants' motion to dismiss—concluding that Plaintiffs had failed to demonstrate the connection between the Defendants and the Verification Act as required by *Ex parte Young*.[5] Plaintiffs promptly appealed, and after briefing and oral argument, the panel affirmed by a vote of 2-1 the district court's dismissal of the Commissioner. (Dismissal of the AG was affirmed 3-0 and is not subject of the instant Petition.)

## REASONS FOR GRANTING REHEARING EN BANC

---

[4] Plaintiffs' pleading allegations, and Judge Phillips's dissent referencing them, reveal how Utah simply hasn't provided the legislative flexibility to accommodate the few operational age verification technologies. Those known to exist plainly do not satisfy the definition of "reasonable age verification methods" under the Act.

[5] The district court also suggested without analysis that Plaintiffs' claims had not ripened and wove into its *Ex parte Young* analysis its concerns about redressability that are properly analyzed as part of an inquiry into Article III standing.

The Court should grant this petition for rehearing en banc[6] because the Decision conflicts with recent Supreme Court precedent, conflicts with prior decisions of this Court, and involves a question of exceptional importance that calls for clarity from the full Court.

## A. The Decision conflicts with recent Supreme Court precedent.

In a footnote, the Decision strains to distinguish *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), in which the Supreme Court considered the justiciability of a constitutional challenge brought by a collection of reproductive-health providers, doctors, and reproductive-rights advocates against numerous government officials concerning their enforcement of Texas SB8 (the "Heartbeat Act"), which created a private cause of action empowering "any person" to sue a provider or other person who performs, or aids or abets, a post-heartbeat abortion. As SB8 was enacted before the Supreme Court decided *Dobbs v. Jackson Women's Health Organization*, 597 U.S. ___ (2022), it reflected an effort to insulate a then-unconstitutional abortion ban from affirmative challenge while creating a "bounty" for

---

[6] The Court's local rules provide that "procedural and interim orders" are not properly the subject of a petition for rehearing en banc. 10th Cir. R. 35.7. The Decision isn't procedural or interim because it fully and finally resolves the appeal in this matter. The fact that the trial court hasn't yet entered a final judgment doesn't change the analysis. This Court has even granted initial en banc consideration to review the denial of a preliminary injunction. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1125 (10th Cir. 2013) (en banc).

private attorneys general to do the state's bidding. The Supreme Court granted certiorari before judgment and, on expedited briefing and argument, rejected the plaintiffs' offensive claims against state court judges, court clerks, and the Texas Attorney General, while allowing them to proceed as to the "executive licensing official[s] who may or must take enforcement actions against the petitioners if they violate the terms of Texas's Health and Safety Code, including S.B. 8." *See Whole Woman's Health*, 595 U.S. at 45-46.

The Decision in our case distinguished the *Whole Woman's Health* holding vis-à-vis those licensing officials, insisting that those officials were amenable to pre-enforcement challenge only "because they had separate and *preexisting* authority to 'take *enforcement* actions against' anyone who violated the statute at issue"—thereby wielding a "direct enforcement duty [that] stands in stark contrast to the Commissioner's oversight of a program that provides him with no *existing* mechanism to enforce the Act and only might provide one of three possible *compliance* methods at some undetermined future point." Decision at 10 n. 8 (all emphasis in original).

As Judge Phillips convincingly argued in his Dissent, however, the Decision misapprehends *Whole Woman's Health* in critical respects—including in its undue focus on identity of timing and codification between challenged law and enforcement authority. *Whole Woman's Health* teaches that "the Commissioner's

7

oversight of the mDL program—the only State-approved compliance mechanism contemplated in SB 287—need not be established at the same time, or in the same section of code, as SB 287." Dissent at 8. "Nor need the Commissioner's duty be a mandatory one," Judge Phillips notes, just so long as "'it exists.'" *Id.* (quoting *Ex parte Young*, 209 U.S. at 157). Of course, *Whole Woman's Health* reaffirms that basic principle, too. *See* 595 U.S. at 35, 45–46 (identifying medical licensing defendants as officials "who *may* or must take enforcement actions against the petitioners if they violate the terms of Texas's Health and Safety Code, including SB 8"); *see also* Dissent at 8 (recognizing that "at least some of the licensing officials' duties to enforce SB 8 were discretionary" yet sufficient to render those officials amenable to suit under *Ex parte Young*).

Finally, although it ostensibly recognized that, at least in the Tenth Circuit, the "connection" to enforcement required under *Ex parte Young* is broader than the right to "ensure compliance," the Decision then distinguished the licensing officials in *Whole Woman's Health* from the Commissioner here by driving a wedge between the former's "direct enforcement duty" and the latter's provision of a critical tool for "compliance." *Compare* Decision at 15 ("[T]he enforcement inquiry under *Ex parte Young* . . . asks whether a defendant enforces or gives effect to the law.") *with* Decision at 10 n.8 ("This direct enforcement duty [of the licensing officials in *Whole Woman's Health*] stands in stark contrast to the Commissioner's

8

oversight of a program that provides him with no *existing* mechanism to enforce the Act and only might provide one of three possible *compliance* methods[.]"). This distinction between "direct enforcement" and provision of a critical tool for "compliance" is irrelevant under Tenth Circuit precedent, *see infra*, and did not feature whatsoever in *Whole Woman's Health*. In *this* Court, so long as the state official "gives effect to" the law, *Ex parte Young* is satisfied.

**B. The Decision conflicts with a seminal precedent of this Court.**

The Decision also conflicts with *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818 (10th Cir. 2007), and pays mere lip service to the "enforcement" required by that case and those that have followed.

As the Decision recognizes, state officials "enforce" a law—and thus, may be sued in an official capacity under *Ex parte Young*— whenever they have "'clearly . . . assisted or currently assist in giving effect to the [contested] law.'" Decision at 6 (quoting *Prairie Band*, 476 F.3d at 828). This is because, as *Prairie Band* makes plain, "to give effect" is the very *definition* of "enforce." *Prairie Band*, 476 F.3d at 828 & n.15 (quoting Webster's Third New International Dictionary 751 (1986)). But somewhere between recitation and application of the standard, the Decision interjected a far more restrictive conception of "enforcement"— demanding a "direct enforcement duty" suggestive of a greater duty to "ensure compliance" that was expressly rejected in *Prairie Band*. *See* 476 F.3d at 828

9

("Defendants, although not specifically empowered to ensure compliance with the statute at issue, clearly have assisted or currently assist in giving effect to the law."); *see also* Dissent at 1-2.

Discussion of *Prairie Band*—and the Decision's characterizations of it—further reveal the lost connection on the road between recitation and application. In *Prairie Band*, this Court held that the Kansas Director of Vehicles "gave effect to and enforced [a] Kansas registration statute by 'managing vehicle registrations and titles and supervising vehicle reciprocity[.]'" Decision at 9 (brackets omitted) (quoting *Prairie band*, 476 F.3d at 828). The Majority suggests, however, that the Director in fact "had express authority to deny the validity of tribal vehicle registrations for purposes of reciprocity"—in other words, the ability to *ensure compliance* with the challenged law. Decision at 9. But <u>nowhere</u> in *Prairie Band* is the Director said to have this authority! The Decision offers a pin cite but no quotation, and the most this Court will find scarcely identified that brand of "enforcement" power held by the Director:

> Defendant Walker, as Director of Vehicles, manages vehicle registrations and titles and supervises vehicle reciprocity; Defendant Wagnon, as the Secretary of Revenue, is the State official—in connection with Defendant Walker—who decided to deny the validity of the Tribe's registrations; and Defendant Seck, as Superintendent of the Kansas Highway Patrol, enforces traffic and other laws of the State related to highways, vehicles, and drivers of vehicles. This satisfies the "some connection" requirement of *Ex parte Young*.

*Prairie Band*, 476 F.3d at 828. Put plainly, it was *not* the Director who could deny the validity of tribal vehicle registrations; *that* duty was born by the Secretary of Revenue and ostensibly levied with some informal input from the Director (surmising from the meaning of "in connection with").

The "facts" that the Majority leaned on so heavily to distinguish *Prairie Band* do not hold up under scrutiny. But even if they did, they would fail to provide meaningful fodder for distinguishing the Commissioner here from the Director there. The *Prairie Band* Court expressly noted that the defendants were "not specifically empowered to ensure compliance with the statute at issue" and yet nevertheless "clearly have assisted or currently assist in giving effect to the law"— making them amenable to suit. The same must be said of the Commissioner, whose connection to the Verification Act lies in his duty to provide the *only* State-guaranteed means by which one might exercise the First Amendment rights regulated by the Act. He might not ensure compliance with that law, but he certainly gives effect to it. And that's sufficient under this Court's precedents.

## C. The Decision involves a question of exceptional importance calling for clarity from the full Court.

At first glance, this case concerns an esoteric issue of procedural law as it relates to a lesser-known Utah state agency. On closer look, it begs a critical question for which clarity is badly needed: Whether a state official who lacks the power to

11

ensure compliance with a challenged law nevertheless "gives effect" to it by administering the one and only state program that provides the law its veneer of constitutionality.

The answer is yes. The Verification Act imposes a constitutionally-suspect prior restraint on protected speech by imposing prerequisite steps for adults to view non-obscene material online. The Act then leaves the required public administration of that prior restraint exclusively to the Commissioner, defining "reasonable age verification methods" to expressly include the "digitized identification card" that only the Department of Public Safety is tasked with pursuing. *See* Dissent at 6-7. But the Commissioner has failed to provide a card with the *online* functionality contemplated by the Legislature, thereby leaving no State-sponsored channels for the exercise of protected speech. *See* Decision at 7 (noting that the mDL program's "functionality is currently limited to an in-person scan"). And although the Act technically allows the *private* market to step in to supply those channels, that market has not proven able to do so sufficiently and affordably—partly because the Legislature has so rigidly defined those "reasonable age verification methods" that the few existing private age-verification vendors are almost certainly out of compliance.

The Decision evades answering the question with a curious sidestep: Because the mDL program lacks the functionality contemplated by the Legislature,

two of three panel judges concluded that the Commissioner in charge of it does not "enforce" the Act in any sense. To the extent that it casts the mDL program's lack of online functionality as "*contraindicative* of a connection between the Commissioner and SB 287's enforcement," *see* Dissent at 8 (emphasis added), the Decision certainly presents a troubling (and Kafkaesque) development wherein a *bug* in a statutory regime (the failure to maintain critical architecture necessary to assure adequate channels for speech) should become the *feature* in the State's efforts to elude a pre-enforcement challenge. It's an irony that Judge Phillips latched onto in his Dissent. *See* Dissent at 8 ("To me, if a state-run program that functions as intended 'gives effect' to another law by providing the only state-approved mechanism by which to comply with that other law, then by virtue of its existence and its scope it 'gives effect' to that law, regardless of whether it currently functions as intended."). And it reflects a critical error of logic and reasoning that the full Court should correct.

But so, too, is the full Court needed to weigh the significance of dicta in *Whole Woman's Health* that the Decision did *not* address. Although the Supreme Court acknowledged in that case that it "has never recognized an unqualified right to pre-enforcement review of constitutional claims in federal court," foundational to its reasoning was its acknowledgment that *some* forum was available for an aggrieved party to assert her constitutional rights. The *Whole Woman's Health*

majority accused dissenting Justice Sotomayor of "wildly mischaracteriz[ing] the impact of [the Court's] decision" by suggesting that it "somehow 'clears the way' for the 'nullification' of federal law." *Whole Woman's Health*, 595 U.S. at 49. After all, "any individual sued under SB 8 may pursue state and federal constitutional arguments in his or her defense," and "[i]f other States pass similar legislation, pre-enforcement challenges like the one the Court approves today [against medical licensing officials] may be available in federal court to test the constitutionality of those laws" and "further pre-enforcement challenges may be permissible in state court and federal law may be asserted as a defense in any enforcement action." *Id.* at 49-50.

But for the John Doe Plaintiff in *this* case—a Utah-based attorney whose regular representations of adult bookstores and sexual device manufacturers require that he visit websites regulated by the Act—there *is* no other hypothetical time, place, suit, or forum in which to assert his rights. As a putative viewer rather than a commercial entity publishing "material harmful to minors" on the internet, he is not subject to an enforcement action under the Verification Act and therefore is not able to violate it to obtain a forum in which to assert his constitutional claims as defenses. This affirmative challenge is the only means by which he can act to vindicate his rights in *any* forum, at *any* time. The nullification of which Justice

14

Sotomayor spoke might have been hypothetical to the Majority in *Whole Woman's Health*, but it is no mere specter in this case.

> Nor will it be in future civil rights litigations, either:
>
> For some parties who rely on injunctions to vindicate their substantive rights, [] defense against an enforcement action is not even a theoretical alternative. Consider, for example, someone who is subjected to unconstitutional prayer in a public school, or who is denied welfare benefits or fired from a job for unconstitutional reasons, or even the plaintiffs in *Brown v. Board of Education*, who experienced racial segregation. Does the Constitution guarantee none of them rights to sue for injunctions or other remedies adequate to enforce their substantive rights?

Richard H. Fallon, Jr., Constitutional Remedies: In One Era and Out the Other, 136 HARV. L. REV. 1300, 1306 (2023).

This concern about rights without remedies was shared by Judge Phillips, too (even if he raised it in his discussion on standing rather than the *Ex parte Young* exception). *See* Dissent at 17-18. If left unchecked, the legislative cynicism manifest in the deliberate insulation of unconstitutional laws from affirmative challenge will not end here, and constitutional rights long taken for granted risk relegation to illusory promises subject to the caprices of state legislatures. This Court is now ideally positioned to impose a critical limit on such a practice while reaffirming its fidelity to Supreme Court and Tenth Circuit precedent.

## CONCLUSION

The Court should grant the petition for rehearing en banc.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) because this brief was produced using a computer and contains 3,535 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word-count function of Microsoft Word.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(A), and the typestyle requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman 14-point.

DATE: October 29, 2024

_____

Jeffrey Sandman
Webb Daniel Friedlander LLP
5208 Magazine St., Ste. 364
New Orleans, LA  70115
(978) 886-0639
jeff.sandman@webbdaniel.law

16

## CERTIFICATE OF SERVICE

I certify that on October 29, 2024, I served the foregoing Petition on all counsel of record through electronic filing using the Court's ECF system.

DATE: October 29, 2024

_____

Jeffrey Sandman
Webb Daniel Friedlander LLP
5208 Magazine St., Ste. 364
New Orleans, LA  70115
(978) 886-0639
jeff.sandman@webbdaniel.law

**ATTACHMENT (PANEL DECISION)**

FILED
United States Court of Appeals
Tenth Circuit

October 1, 2024

Christopher M. Wolpert
Clerk of Court

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

FREE SPEECH COALITION, INC.; D.S.
DAWSON; JOHN DOE; DEEP
CONNECTION TECHNOLOGIES, INC.;
CHARYN PFEUFFER; JFF
PUBLICATIONS, LLC,

       Plaintiffs - Appellants,

v.

JESS L. ANDERSON, in his official
capacity as the Commissioner of the Utah
Department of Public Safety; SEAN D.
REYES, in his official capacity as the
Attorney General of the State of Utah,

       Defendants - Appellees.

No. 23-4104

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:23-CV-00287-TS)**

_____

Jeffrey Keith Sandman of Webb Daniel Friedlander LLP, New Orleans, Louisiana (D.
Gill Sperlein of Law Offices of D. Gill Sperlein, San Francisco, California, and Jerome
Mooney of Weston, Garrou & Mooney, Salt Lake City, Utah, with him on the briefs), for
Plaintiffs-Appellants.

Sarah Goldberg, Assistant Solicitor General (David N. Wolf and Lance Sorenson,
Assistant Attorneys General, with her on the brief), Salt Lake City, Utah, for Defendants-
Appellees.

_____

Before **PHILLIPS**, **MORITZ**, and **EID**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

———————————————————

In this action, plaintiffs Free Speech Coalition, Inc., D.S. Dawson, John Doe, Deep Connection Technologies, Inc., Charyn Pfeuffer, and JFF Publications, LLC seek to prevent defendants—the Attorney General of Utah and the Commissioner of the Utah Department of Public Safety—from enforcing Utah's recently enacted Online Pornography Viewing Age Requirements (the Act), 2023 Utah Laws Ch. 262 (codified at Utah Code Ann. §§ 78B-3-1001 to -1002). The Act allows private parties to sue commercial entities that provide certain restricted content without first verifying that a user is at least 18 years old, and plaintiffs allege that it violates the First Amendment (among other constitutional guarantees). *See* §§ 78B-3-1001 to -02. The district court granted defendants' motion to dismiss, holding in relevant part that defendants were entitled to Eleventh Amendment immunity. In reaching this conclusion, the district court rejected plaintiffs' attempt to utilize the exception to such immunity created in *Ex parte Young*, 209 U.S. 123 (1908), reasoning that the exception did not apply because defendants did not enforce or give effect to the Act. We similarly conclude that immunity bars plaintiffs' claims. Because neither defendant enforces or gives effect to the Act, *Ex parte Young* does not apply, and we affirm dismissal.

## Background

The Act requires certain commercial entities to verify the age of users seeking to access "material harmful to minors" online.[1] *See* § 78B-3-1002(1). It identifies three approved methods for age verification: (1) "a digitized information card"; (2) "an independent, third-party[,] age[-]verification service"; or (3) "any commercially reasonable method that relies on public or private transactional data to verify the age of the person attempting to access the material." § 78B-3-1001(9).[2] In connection with this age-verification requirement, the Act creates a private cause of action: "[a] commercial entity that is found to have violated this [Act] shall be liable to an individual for damages resulting from a minor's accessing the material." § 78B-3-1002(3).

According to plaintiffs' complaint,[3] the Act violates their First Amendment free-speech rights by imposing a content-based restriction on protected speech that fails strict scrutiny. Plaintiffs additionally claim, among other things, that the Act

---

[1] The Act defines the term "material harmful to minors" in part as "any material that the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest." § 78B-3-1001(5).

[2] The Act uses the term "digitized *information* card" as one of the reasonable methods of age verification, "as defined in this section." § 78B-3-1001(9)(a) (emphasis added). But the defined term in this section is "digitized *identification* card." § 78B-3-1001(2) (emphasis added). Defendants invite us to "presume that the Utah [l]egislature intended to use these terms interchangeably." Aplee. Br. 5 n.2. And because plaintiffs do not draw our attention to this distinction or make any argument based on it, we accept defendants' invitation.

[3] We accept the well-pleaded factual allegations in plaintiffs' complaint as true at this stage. *See Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013).

3

violates their Fourteenth Amendment due-process and equal-protection rights because it is unconstitutionally vague, impermissibly intrudes upon fundamental liberty and privacy rights, and draws content-based distinctions among persons engaged in free speech. Plaintiffs thus seek a declaration that the Act is unconstitutional.

They also seek preliminary and permanent injunctive relief preventing the Commissioner and the Attorney General from enforcing the Act. As to the Commissioner, plaintiffs allege that he enforces the Act through his oversight of a department that manages Utah's Mobile Driver's License program (mDL program), which provides an official copy of an individual's driver's license or identification card to their mobile device. *See* Utah Code Ann. § 53-3-235(1)(b) (directing driver-license department to "establish a process and system for an individual to obtain an electronic license certificate or identification card"). Plaintiffs allege that the mDL program could provide one way of verifying a user's age, even though they acknowledge that the program "does not yet provide for the online verification necessary for the card to be" used for that purpose. App. 20. As to the Attorney General, plaintiffs contend that he enforces the Act through his general legal authority in the state.

Defendants moved to dismiss, arguing that they are protected by Eleventh Amendment immunity and that the *Ex parte Young* exception to that immunity does not apply because they do not enforce the Act. The district court agreed with

defendants' immunity argument and dismissed plaintiffs' complaint for lack of subject-matter jurisdiction.[4] Plaintiffs appeal.

## Analysis

We review a district court's Eleventh Amendment analysis de novo. *See Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 527 (10th Cir. 2022). "The Eleventh Amendment constitutionalizes the doctrine of state sovereign immunity." *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021). It states that "[t]he [j]udicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by [c]itizens of another [s]tate, or by [c]itizens or [s]ubjects of any [f]oreign [s]tate." U.S. Const. amend. XI. This immunity extends as well "to suits brought by citizens against their own state." *Hendrickson*, 992 F.3d at 965. And it applies not just to suits brought against states themselves but also to "suit[s] against a state official in his or

---

[4] Defendants also argued that plaintiffs' claims were not ripe and that plaintiffs lacked standing under Article III of the U.S. Constitution. As to ripeness, the district court determined that plaintiffs' claims against the Commissioner were not ripe because, at the time of the decision, the mDL program did "not yet provide for online verification," and speculations about its potential effect were "premature." App. 256. And although the district court did not directly discuss Article III standing, it noted that plaintiffs' requested relief, a preliminary injunction, would not redress their injury by warding off potential suits by private parties. Given that we resolve this case based on immunity, we do not reach ripeness or standing. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (explaining "that a federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits'" because "there is no mandatory 'sequencing of jurisdictional issues'" (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584–85 (1999))).

her official capacity." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

But *Ex parte Young* created an exception under which individuals can sue state officers in their official capacities if the lawsuit seeks prospective relief for an ongoing violation of federal law. 209 U.S. at 159–60; *see also Hendrickson*, 992 F.3d at 965. To come within this exception, the "state official 'must have some connection with the enforcement' of the challenged statute." *Hendrickson*, 992 F.3d at 965 (quoting *Ex parte Young*, 209 U.S at 157). Though the official need not "have a 'special connection' to the unconstitutional act or conduct," they must "have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007) (quoting *Ex parte Young*, 209 U.S. at 157). An official enforces a law when they "clearly . . . assisted or currently assist in giving effect to the [contested] law." *Id.* (footnote omitted); *see also id.* at 828 n.15 (noting that "'[t]o give effect' is the definition of 'enforce'" (quoting Webster's Third New International Dictionary 751 (1986))).

Here, the district court concluded that even though plaintiffs seek prospective relief for an alleged ongoing violation of federal law, neither defendant enforced or gave effect to the allegedly unconstitutional Act for purposes of the *Ex parte Young* exception. Plaintiffs dispute this ruling, and we consider application of the exception to each defendant in turn.

## I.    The Commissioner of the Utah Department of Public Safety

Although plaintiffs alleged and argued that the Commissioner enforced the Act

through his management of the mDL program, the district court disagreed. It first

noted that the Act itself places enforcement authority with private third parties, not

with the Commissioner. And in rejecting plaintiffs' mDL argument, the district court

determined that even though the mDL program provides a digitized identification

card—thereby potentially supplying one of the three statutory options for age

verification under the Act—this connection was too attenuated to conclude that the

Commissioner gives effect to the Act by managing the mDL program. The district

court also noted that the mDL program's "functionality is currently limited to an in-

person scan" and thus does not allow for *online* age verification. App. 256. So, the

district court reasoned, the Commissioner had not assisted and was not currently

assisting in giving effect to the Act.

On appeal, plaintiffs reassert their position that the Commissioner is

sufficiently connected to the Act because he oversees the mDL program, which

plaintiffs describe as the "only [s]tate-assured 'reasonable age[-]verification method'

compliant with the Act." Aplt. Br. 13 (quoting § 78B-3-1001(9)). But critically, the

mDL program does not currently provide for online age verification and thus could

not possibly give effect to the Act in its current state, regardless of its potential

relevance. Plaintiffs seek to characterize the mDL's lack of operability as a

"dereliction" of the Commissioner's duty to ensure a viable means of age

verification. *Id.* at 14. Yet this argument puts the cart before the horse—nothing in

the Act expressly refers to the mDL program or promises a state-sponsored means of

7

age verification, so the Commissioner has no such duty to begin with.[5] Nor does the mDL statute require the online functionality that would allow it to operate as a means of complying with the Act.[6] For this reason, the Commissioner neither enforces nor gives effect to the allegedly unconstitutional Act for purposes of the *Ex parte Young* exception.[7]

Resisting this conclusion, plaintiffs argue that our decision in *Prairie Band*, 476 F.3d 818, supports their position that the Commissioner's oversight of the mDL program gives effect to the Act. There, an Indian tribe in Kansas sued the state's Director of Vehicles and Superintendent of the Highway Patrol to prevent the

---

[5] The dissent suggests that the Act refers to the mDL program by including the terms "state-approved" and "license or identification card" in the definition of "digitized identification card." *See* § 78B-3-1001(2). Plaintiffs do not make this textual argument, and it fails to persuade us; the Act could have expressly referred to the preexisting mDL program, and it does not do so.

[6] The dissent speculates that if the mDL program "function[ed] *as intended*," then the Commissioner's supervision of the program would give effect to the Act. Dissent 8 (emphasis added). But the dissent provides scant support for its position that the mDL program is "intended" to operate in a way that would effectuate compliance with the Act. *Id.* At best, the dissent elsewhere points to statements on the website for Utah's public-safety department noting "that 'online or unattended verification' is part of the 'future of [the] mDL [program].'" *Id.* at 2 (emphasis omitted) (quoting Utah Dep't of Pub. Safety, *Utah mDL FAQs*, https://dld.utah.gov/mdlfaqs/ [https://perma.cc/TM9W-NR78]). Unsurprisingly, plaintiffs do not cite or seek to rely on these statements in their complaint or on appeal. The reason is simple: a website's forecast of the future contours of the mDL program does not establish a present-day legal duty to ensure that the program provides a state-sponsored means of complying with the Act.

[7] Defendants additionally argue that the Commissioner's enforcement connection to the Act is diminished by the availability of other methods of compliance. Plaintiffs dispute the functional availability of those other methods, but we need not delve into that dispute because the availability of other methods of compliance tells us nothing about whether defendants have the requisite connection to the Act to be amenable to suit under *Ex parte Young*.

enforcement of a law requiring that Kansas drivers have license plates registered with Kansas or a reciprocal state. *Id.* at 820. Because the tribe was located within the bounds of the state of Kansas, it did not fall under the law's reciprocity exception, and drivers with tribally registered vehicles risked violating the Kansas statute; indeed, several had received tickets prior to the lawsuit. *Id.* at 820–21. We held that the *Ex parte Young* exception applied to permit suit against these defendants because each "assisted . . . in giving effect to the law." *Id.* at 828 (footnote omitted). In particular, the director gave effect to and enforced the Kansas registration statute by "manag[ing] vehicle registrations and titles and supervis[ing] vehicle reciprocity," and the superintendent did so by "enforc[ing] traffic and other laws of the [s]tate related to highways, vehicles, and drivers of vehicles." *Id.*

Plaintiffs maintain that, just as the director and superintendent gave effect to the Kansas registration statute in *Prairie Band*, "the Commissioner 'give[s] effect' to the . . . Act by . . . providing a critical channel for constitutionally[ ]protected speech." Aplt. Br. 15. We disagree. Like the district court reasoned, the Commissioner's authority over the mDL program is far more attenuated than the enforcement connections in *Prairie Band*. There, the director managed registrations and had express authority to deny the validity of tribal vehicle registrations for purposes of reciprocity; and the superintendent enforced violations of the registration law by issuing tickets. *See Prairie Band*, 476 F.3d at 828. But here, the Commissioner's authority over the mDL program does not give similar effect to the Act. To begin with, the mDL program is not required to and does not currently

9

provide for online age verification. Moreover, the Act and the mDL program exist in parallel: neither depends on the other. So even if the mDL program did provide for online age verification, the Commissioner supervises that program independently from the Act and not as a means of enforcing or giving effect to the Act. And on the other hand, if the mDL program did not exist, compliance with the Act would still be possible via the other verification methods, and private parties could still assert violations of the Act. So *Prairie Band* offers the plaintiffs little assistance here.[8]

But we do find analogous facts and persuasive authority in *Peterson*, 707 F.3d 1197. There, a plaintiff sued the Director of Colorado Public Safety to challenge a statute that limited concealed handgun licenses to Colorado state residents and residents of states with established reciprocity. *Id.* at 1202. Because the statute expressly delegated enforcement responsibility to sheriffs, we held that *Ex parte Young* did not exempt the director from Eleventh Amendment immunity. *Id.* at 1206–07. In so doing, we rejected the plaintiff's argument that the director's maintenance of a database of the states with reciprocity provided the requisite connection. *Id.* at 1206. In particular, we explained that "maintenance of a database may provide a

---

[8] The dissent also invokes a portion of the Supreme Court's recent ruling in *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), but we find this case easily distinguishable. There, the Court held that certain licensing-board defendants could be sued under the *Ex parte Young* immunity exception because they had separate and *preexisting* authority to "take *enforcement* actions against" anyone who violated the statute at issue. *Id.* at 45–46 (emphasis added). This direct enforcement duty stands in stark contrast to the Commissioner's oversight of a program that provides him with no *existing* mechanism to enforce the Act and only might provide one of three possible *compliance* methods at some undetermined future point.

convenient source for sheriffs seeking information relevant to . . . reciprocity, but [*Ex*] *parte Young* requires a nexus between the defendant and '*enforcement*' of the challenged statute." *Id.* (quoting *Ex parte Young*, 209 U.S. at 157). The same is true here: the Commissioner's mDL program may (eventually) offer one convenient way to verify a user's age for purposes of complying with the Act, but it does not amount to "a particular duty to 'enforce' the statute in question." *Id.* (quoting *Prairie Band*, 476 F.3d at 828). Because the plaintiffs have failed to show the requisite nexus between the Commissioner and the enforcement of the challenged statute, the Commissioner does not fall within the *Ex parte Young* exception and is entitled to sovereign immunity.

## II.    The Attorney General

Plaintiffs invoke the Attorney General's blanket authority over state law as the requisite connection to the Act. The district court disagreed, concluding that the Attorney General lacked the requisite connection because the Act expressly places enforcement authority in the hands of private citizens: "[a] commercial entity that is found to have violated this section shall be liable to *an individual* for damages." § 78B-3-1002(3) (emphasis added). And the district court reasoned that in this context, the Attorney General's generic duty to enforce the laws of the state was insufficient to invoke *Ex parte Young*.

On appeal, plaintiffs maintain that even though the Act includes only a private right of action, the Attorney General is nevertheless excepted from immunity based on his general legal authority in the state of Utah. Yet the Supreme Court identified

11

the flaw in this argument in *Ex parte Young*. There, the Court explained that if a general duty to enforce the law were sufficient to avoid immunity, "then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general" because the governor is, "in a general sense, charged with the execution of all [a state's] laws" and the attorney general "might represent the state in litigation involving the enforcement of its statutes." *Ex parte Young*, 209 U.S. at 157. The Court recognized that although this "would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals," it would be inconsistent with state sovereign immunity. *Id.*

Consistent with this guidance, we have explicitly held that *Ex parte Young* requires something "more than a mere general duty to enforce the law." *Hendrickson*, 992 F.3d at 965 (quoting 13 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3524.3 (3d ed. Oct. 2020 update)). In *Hendrickson*, the plaintiff worked for the state and sought a declaration that a New Mexico statute authorizing a public-sector union to serve as his exclusive bargaining representative violated his First Amendment rights. *Id.* at 956. Among other defendants, the plaintiff sued New Mexico's governor and attorney general, arguing that both officials enforced the relevant statute. *Id.* Relying on *Chamber of Commerce of the United States v. Edmondson*, 594 F.3d 742 (10th Cir. 2010), we concluded that the governor and attorney general did not fall within the *Ex parte Young* exception because their only connection to the challenged statute—which placed enforcement authority in an

independent board—was "their general enforcement power." *Id.* at 967; *see also Edmondson*, 594 F.3d at 754, 760 (holding that attorney general was not proper defendant for challenge to portion of statute designating certain conduct as discriminatory practice because attorney general lacked authority to prosecute that kind of discriminatory practice and statute placed enforcement authority in human-rights commission).

Just as the statute in *Hendrickson* vested enforcement authority in an independent board, the statute here places enforcement authority with private individuals. *See Hendrickson*, 992 F.3d at 960; *cf. Edmondson*, 594 F.3d at 754.[9] Additionally, just as the governor in *Hendrickson* lacked the authority to remove members of that independent board at will, the Attorney General here lacks any power to direct the actions of private actors or prevent them from seeking enforcement of the Act. *See Hendrickson*, 992 F.3d at 966.

Resisting this authority, plaintiffs rely on *Petrella v. Brownback*, 697 F.3d 1285 (10th Cir. 2012). There, the plaintiffs challenged a Kansas law restricting the allocation of local property taxes to local school districts and named Kansas's attorney general as a defendant. *Id.* at 1291. We noted that "the proper vehicle for challenging the constitutionality of a state statute, where only prospective,

---

[9] Seeking to distinguish *Edmondson*, plaintiffs maintain that our holding in that case resulted from the plaintiffs' "fail[ure] to connect the dots" by invoking the general authority of the attorney general. Aplt. Br. 22. Not only is this sheer speculation, it ignores that the statute in *Edmondson* specifically vested enforcement authority in a human-rights commission. *See* 594 F.3d at 754.

non[]monetary relief is sought, is an action against the state officials responsible for the enforcement of that statute." *Id.* at 1293–94 (citing *Ex parte Young*, 209 U.S. at 161). We then tacitly concluded that the attorney general fell within the *Ex parte Young* exception and was a proper defendant because he "ha[d] responsibility for the enforcement of the laws of the state." *Id.* at 1294.

Plaintiffs maintain that the Attorney General in this case similarly falls within the *Ex parte Young* exception based on his general responsibility for enforcing Utah state laws. But crucially, the statute at issue in *Petrella* did not include any particular enforcement provisions, meaning that the ability to enforce it was necessarily encompassed by the attorney general's overall enforcement authority. *Id.* (citing Kan. Stat. Ann. § 75-702, which imparts attorney general with "authority to prosecute any matter related to a violation of" a range of Kansas codes). Here, by contrast, the Act places enforcement ability specifically with private individuals. *See* § 78B-3-1002(3). Indeed, we distinguished *Petrella* on precisely these grounds in *Hendrickson*, and we do so again here. *See Hendrickson*, 992 F.3d at 967–68.

The Supreme Court's recent ruling in *Whole Woman's Health*, 595 U.S. 30, only fortifies our precedent. There, in relevant part, the Court held that a state attorney general could not be sued in a pre-enforcement challenge to an abortion regulation that placed enforcement authority in the hands of private parties. The Court emphasized that in such context, the attorney general possessed no "enforcement authority . . . that a federal court might enjoin him from exercising." *Id.* at 43. Plaintiffs unsuccessfully seek to distinguish *Whole Woman's Health* by

14

highlighting that there, "the specific statute . . . forbade *any* [a]ttorney[-g]eneral enforcement whatsoever," whereas the statute here does not expressly "sever[] the connection between the [attorney general's] duties and the . . . Act." Aplt. Br. 31–32. But the enforcement inquiry under *Ex parte Young* does not ask whether enforcement has been expressly prohibited; it asks whether a defendant enforces or gives effect to the law. *See* 209 U.S. at 157. And *Whole Woman's Health*'s holding did not turn on the fact that the challenged statute explicitly divested enforcement authority from state officials—the Court did not even mention as much. Instead, it simply explained that the plaintiffs failed to "direct this Court to any enforcement authority the attorney general possesses in connection with [the challenged statute] that a federal court might enjoin him from exercising." *Whole Woman's Health*, 595 U.S. at 43. Similarly, plaintiffs here do not point us to any enforcement authority the Attorney General possesses in connection with the Act.

Finally, plaintiffs argue that even if the Attorney General is not bound to enforce the Act by his general legal duties, he is nevertheless a proper defendant under *Ex parte Young* because Utah Code Ann. § 67-5-1(1)(g) requires him to offer his "opinion in writing . . . to any state officer, board, or commission." In support, plaintiffs point to *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014). There, we held that the state attorney general was a proper defendant in a challenge to Utah's laws banning same-sex marriage because he had supervisory authority over the county clerks who were in charge of issuing marriage licenses (in contrast to an earlier case reaching the opposite result where marriage licenses were in exclusive control of the

15

judiciary). *Id.* at 1199–202, 1204. As an additional example of the attorney general's authority over "state agencies with responsibility for the recognition of out-of-state marriages," we reasoned that § 67-5-1(g) empowered the attorney general to direct the state tax commission to recognize joint tax returns filed by same-sex couples. *Id.* at 1203. So plaintiffs argue that here, "the Attorney General could direct the Commissioner to administer the mDL program in ways that would mitigate or eliminate the constitutional harms imposed by the . . . Act." Aplt. Br. 20. But as already discussed, the Commissioner does *not* give effect to the Act. And even if he did, the connection plaintiffs seek to draw is far more attenuated than in *Kitchen* and is simply too tenuous to permit us to conclude that the Attorney General has enforcement authority over the Act. *Cf. Kitchen*, 755 F.3d at 1203 (explaining attorney general's authority to direct tax commission to recognize same-sex joint filings); *Doyle v. Hogan*, 1 F.4th 249, 256 (4th Cir. 2021) (holding that state law requiring attorney general to "'[g]ive his opinion in writing . . . on any legal matter or subject'" did not "give the [a]ttorney [g]eneral control over *enforcing* the [challenged a]ct" (first alteration and omission in original) (quoting Md. Const. art. V, § 3(a)(4))).

In sum, the Attorney General does not enforce or give effect to the Act and thus cannot be named as a defendant in this case under the *Ex parte Young* exception to Eleventh Amendment immunity. And because both defendants are immune from suit, we affirm the district court's dismissal order without reaching the issues of ripeness and constitutional standing.

## Conclusion

The state sovereign immunity enshrined in the Eleventh Amendment confers immunity on the Attorney General and the Commissioner in their official capacities, and because neither official enforces or gives effect to the Act, the *Ex parte Young* exception to that immunity does not apply. We therefore affirm the district court's order dismissing plaintiffs' complaint.

23-4104, *Free Speech Coalition, Inc., et al. v. Anderson, et al.*
**PHILLIPS, J.**, dissenting in part.

I agree with the majority that the Utah Attorney General lacks a sufficient connection to the enforcement of Utah Code Ann. §§ 78B-3-1001 to -1002 (SB 287) to be a proper defendant under *Ex parte Young*, but I disagree that the Commissioner of the Utah Department of Public Safety similarly lacks such a connection. In my view, the Plaintiffs have shown that the Commissioner gives effect to the Act and is therefore a proper defendant under *Ex parte Young*; consequently, I would reverse in part and remand for further proceedings as to the Commissioner.

## I.     **The Commissioner may be sued under *Ex parte Young*.**

As I see it, the Commissioner has a sufficient connection with SB 287's enforcement to be sued under *Ex parte Young*'s exception to sovereign immunity. In *Ex parte Young*, the Court clarified that a state "officer must have some connection with the enforcement of the [challenged] act" to be exempt from sovereign immunity. 209 U.S. 123, 157 (1908). In this circuit, to "enforce" a law means "[t]o give effect" to it, so though a state actor may "not [be] specifically empowered to ensure compliance with the statute at issue," that state actor is a proper defendant if he or she "assist[s] . . . in giving effect to the law." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 & n.15 (10th Cir. 2007). So under *Prairie Band*, "giving effect to" a statute does

not mean that an official must "ensure compliance" with it, such as through exercising prosecutorial authority. *Id.*

Here, the Commissioner gives effect to SB 287 through his oversight of the mDL program, which, pursuant to Utah's Driver Licensing Act, directs the Driver License Division to "establish a process and system for an individual to obtain an electronic license certificate or identification card." Utah Code Ann. § 53-3-235(1)(b). Per the statute, this duty commenced on January 1, 2022, *id.*, and so was already in existence when SB 287 became effective on May 3, 2023, § 78B-3-1002. The Utah Department of Public Safety's website describes the electronic identification card as "an official signed copy of your driver license or identification card placed on your mobile device for you to control," which, "[u]nlike the physical card and barcode, [allows] you [to] . . . limit the data you share with businesses or entities that you interact with." Utah Department of Public Safety, *Utah Mobile Driver License (mDL) Program*, https://dld.utah.gov/utahmdl [https://perma.cc/CS5F-C8TA]. The mDL website also asserts that "online or unattended verification" is part of the "*future* of mDL." Utah Department of Public Safety, *Utah mDL FAQs*, https://dld.utah.gov/mdlfaqs [https://perma.cc/QPE5-TQEN] (emphasis added).

Though § 53-3-235(1)(b) does not specify that the electronic-identification card must have online functionality, the Driver License Division publicly contemplates this in its plans. And though not explicitly, SB 287 refers

2

to the Utah Department of Public Safety's mDL program in its definition of a
"[d]igitized identification card":

> a data file available on any mobile device which has connectivity to
> the Internet through a *state-approved* application that allows the
> mobile device to download the data file from a state agency or an
> authorized agent of a state agency that contains all of the data
> elements visible on the face and back of a *license or identification
> card* and displays the current status of the license or identification
> card.

§ 78B-3-1001(2) (emphases added). The cross-referencing between SB 287 and

the mDL program seems evident in SB 287's use of the term "[d]igitized

*identification* card," *id.* (emphasis added)—which tracks the Driver Licensing

Act's use of the term "electronic . . . *identification* card," § 53-3-235(1)(b)

(emphasis added)—even though SB 287 elsewhere uses the term "[d]igitized

*information* card," § 78B-3-1001(9)(a) (emphasis added). The parties do not

direct us to another "state-approved" system that would provide a digitized

"license or identification card" other than the mDL program. § 78B-3-1001(2).

The Defendants assert that the Plaintiffs have two other methods by

which to comply with SB 287. But the Plaintiffs respond that the other two

methods are impossible or pose unacceptable risks of noncompliance.[1] The

---

[1] The three methods provided for in SB 287 are:

(9)   "Reasonable age verification methods" means verifying that
the person seeking to access the material is 18 years old or
older by using any of the following methods:

*(footnote continued)*

3

Plaintiffs argue that the state-provided digitized identification card "is not just a legislatively-designed 'fast lane' to regulated content on the internet; it might in fact be the *only* lane" because "the Legislature has so rigidly defined the 'reasonable age verification methods' that existing private age-verification vendors are almost certainly out of compliance with the demands of Utah law." Op. Br. at 13. The Plaintiffs raised similar points below, and because this is an appeal from a motion to dismiss based on subject-matter jurisdiction, we take the Plaintiffs' "allegations in the complaint as true." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013).

In their complaint, the Plaintiffs allege that the third option under subsection (c) is too vague to implement: "The statutory catch-all permitting 'any commercially reasonable method that relies on public or private

---

| | |
|---|---|
| (a) | use of a digitized information card as defined in this section; |
| (b) | verification through an independent, third-party age verification service that compares the personal information entered by the individual who is seeking access to the material that is available from a commercially available database, or aggregate of databases, that is regularly used by government agencies and businesses for the purpose of age and identity verification; or |
| (c) | any commercially reasonable method that relies on public or private transactional data to verify the age of the person attempting to access the material. |

§ 78B-3-1001(9).

transactional data' as a means of verifying a user's age provides no guideposts whatsoever, as 'commercially reasonable' is a vague term not defined by the Act." App. at 31 ¶ 43 (quoting § 78B-3-1001(9)(c)). And they point out that "nothing requires that any such methods be made available to all website operators, operate reliably with common computer software, or even exist in the first place." *Id.* at 33 ¶ 49. Without a state-approved compliance mechanism, they argue, "Utah may not statutorily impose a prior restraint only to leave its operation entirely to others who may or may not take up the mantle—*particularly* when leaving key terms like 'commercially reasonable' undefined." *Id.*

The Plaintiffs further allege that some websites have shut down service in Utah because of SB 287, and that other sites are inaccessible because there is no viable age-verification method available to allow viewers to access those sites. *See, e.g.*, *id.* at 15 ¶ 13 ("PornHub has shut down access to Utahns, [and so] Dawson has been unable to access his own account . . . ."); *id.* at 16 ¶ 14 ("[B]ecause Utah's only digital identification card does not offer online verification capabilities," Plaintiff John Doe, an attorney, "has no way to access [his client's] sites at all."). If the other two methods were workable, the operators of websites like Pornhub would likely have found a way to comply with SB 287.

What's more, other evidence in the record supports the complaint's allegations about the lack of workability of subsections (b) and (c): Addressing

subsection (b), the Executive Director of Free Speech Coalition (FSC) noted

that "verification through 'an independent, third-party age verification service'

[is not] possible where compliance demands that the service cross-reference

personal information of Utah residents against 'a commercially available

database . . . that is regularly used by government agencies and business for the

purpose of age and identity verification.'" App. at 83. This is because "Utah

does not provide access to its identity databases to third-party vendors." *Id.*

Addressing the third option under subsection (c), FSC's Executive Director

noted that "verification via 'any commercially reasonable method' is also

impossible where that method must rely on 'public or private transactional

data' to verify the user's age. FSC members do not know what 'commercially

reasonable' means and do not know of third-party vendors using such

transactional data to age-verify users." *Id.* at 83–84.

 Given the vagueness of and technical difficulties with subsections (b) and

(c), the Commissioner's connection to SB 287's enforcement through the mDL

program referenced in subsection (a) becomes more obvious. As I see it,

because the Commissioner oversees the mDL program—the only state-approved

compliance mechanism available to the Plaintiffs—he has a sufficient nexus

with SB 287's enforcement to be a proper defendant under *Ex parte Young*.

 The majority puts much weight on the independence of the mDL program

from SB 287. But contrary to what the majority suggests, it does not matter that

"the Act and the mDL program exist in parallel," that "neither depends on the

other," or that "the Commissioner supervises that program independently from the Act." Maj. Op. at 10. The Commissioner's duty need not be "declared in the same act which is to be enforced" but "if it otherwise exist it is equally efficacious." *Ex parte Young*, 209 U.S. at 157. And "whether [the Commissioner's duty] arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *Id.*

More recently, in *Whole Woman's Health v. Jackson*, the Court concluded that several medical licensing-board officials had a sufficient connection with a state law providing for an exclusively private right of action against abortion providers (SB 8), even though those officials were appointed under a different, independent, and pre-existing part of Texas's code than SB 8. 595 U.S. 30, 35, 45–46 (2021). Those licensing-board defendants certainly did not depend on a newly added section of the Health and Safety Code (SB 8) for their longstanding disciplinary role under the Occupations Code, nor did SB 8's private civil enforcement mechanism depend on the licensing-board defendants. *See id.* Yet the Court found that they met *Ex parte Young*'s exception because "[e]ach of these individuals is an executive licensing official who *may* or must take enforcement actions against the petitioners if they violate the terms of Texas's Health and Safety Code, including S. B. 8." *Id.* (emphasis added). In the Court's view, then, at least some of the licensing officials' duties to enforce SB 8 were discretionary, yet the Court still found a sufficient connection for them to be proper defendants under *Ex parte Young*.

7

As *Whole Woman's Health* teaches, the Commissioner's oversight of the mDL program—the only state-approved compliance mechanism contemplated in SB 287—need not be established at the same time, or in the same section of code, as SB 287. Nor need the Commissioner's duty be a mandatory one. The important thing is that "it exists." *Ex parte Young*, 209 U.S. at 157.

Another sticking point for the majority (and the district court) is the mDL program's current lack of online functionality, which it finds contraindicative of a connection between the Commissioner and SB 287's enforcement: "[C]ritically, the mDL program does not currently provide for online age verification and thus could not possibly give effect to the Act in its current state, regardless of its potential relevance." Maj. Op. at 7; *Free Speech Coal. v. Anderson*, 685 F. Supp. 3d 1299, 1305 (D. Utah 2023) ("Further, as noted, the mDL program's online verification is not currently operative. Its functionality is currently limited to an in-person scan. As such, it can hardly be said that Commissioner Anderson clearly has assisted or currently assists in giving S.B. 287 effect.").

I don't think that is the law. To me, if a state-run program that functions as intended "gives effect" to another law by providing the only state-approved mechanism by which to comply with that other law, then by virtue of its existence and its scope it "gives effect" to that law, regardless of whether it currently functions as intended.

8

This is the key difference between this case and *Peterson*, a case the majority finds comparable. The majority likens the official's oversight of the state-reciprocity database in *Peterson* to the Commissioner's oversight of the mDL program here. But in *Peterson*, the database's functioning had no bearing on the public's ability to comply with the concealed-carry law or the sheriffs' ability to enforce it. 707 F.3d at 1206. The reciprocity database merely provided "a convenient source for sheriffs seeking information relevant to . . . reciprocity" when they enforced the statute. *Id.* So the database could not have "give[n] effect" to the concealed carry law, *Prairie Band*, 476 F.3d at 828 n.15 (citation omitted), whether through enforcement or through compliance, because the database was wholly incidental to the concealed-carry law, *see Peterson*, 707 F.3d at 1206. If the reciprocity database in *Peterson* stopped functioning, nothing material would change about the sheriffs' enforcement of or the public's compliance with the law. But take away the mDL's online functionality here, and compliance with SB 287 is not possible.

So I respectfully disagree with the majority and would hold that by overseeing the only state-approved compliance mechanism in the statute, the Commissioner has a sufficient connection to SB 287's enforcement to be sued under *Ex parte Young*'s exception to sovereign immunity.

9

## II.    The Plaintiffs have Article III standing.

The majority does not reach the Defendants' standing and ripeness arguments because it resolves the case on sovereign-immunity grounds. Because I would reverse, I briefly address standing and ripeness.

To establish Article III standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Related to those standing elements, we also review "whether a claim is ripe for review." *United States v. Vaquera-Juanes*, 638 F.3d 734, 736 (10th Cir. 2011) (quoting *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498–99 (10th Cir. 1995)).

### A.    Injury

On appeal, the Defendants do not challenge that the Plaintiffs have suffered injury, nor did the district court hold otherwise, and so I focus on the causation and redressability aspects of standing. But the causation and redressability prongs of the standing inquiry require us to parse the connection between the Commissioner and the Plaintiffs' injuries; so we first need to understand the injuries the Plaintiffs have suffered (and will suffer) so we can assess what caused them and how they may be redressed.

The Plaintiffs comprise FSC and several different individuals and entities. FSC "sues on its own behalf and on behalf of its members," who are

10

"businesses and individuals involved in the production, distribution, sale, and presentation of constitutionally-protected and non-obscene materials that are disseminated to consenting adults via the internet." App. at 14 ¶ 12. Among the individual plaintiffs here are D. Dawson, a 30-year-old resident of Utah who writes gay erotica and produces AI-narrated audiobooks: he drives traffic to his e-commerce site from adult sites such as PornHub and xHamster. But since SB 287 went into effect "PornHub has shut down access to Utahns" and so Dawson "has been unable to access his own account" forcing him to consider "buy[ing] a VPN subscription as an end-around." *Id.* at 15–16 ¶ 13.

Another plaintiff, John Doe, is a Utah-based attorney who "represents various adult bookstores and sexual device manufacturers, which requires that he occasionally visit websites that contain a substantial portion of material that may be deemed 'harmful to minors' under the Act." *Id.* at 16 ¶ 14. "[B]ecause Utah's only digital identification card does not offer online verification capabilities, he currently has no way to access those sites at all." *Id.*

Another plaintiff provides "a judgment-free online educational platform focused on sexual wellness" for clients around the world, including the United States, and reaches 39,000 people in Utah alone. *Id.* ¶ 15. That plaintiff fears that its online school "contains a 'substantial portion' of content that meets the statutory definition of 'material harmful to minors'" and that Utah teenagers will be unable to access this educational content under SB 287. *Id.* at 17 ¶ 15.

11

Another individual plaintiff is a creator of online sexual content, much of which meets the statutory definition of "material harmful to minors." *Id.* at 18 ¶ 16. Though she "is fastidious about ensuring that her fans are adults, she worries that her low-tech efforts do not meet the definition of 'reasonable age verification methods.'" *Id.*

And another plaintiff operates an online platform that allows "independent producers/performers of erotic audiovisual works to publish their content" on a channel hosted by that platform, and to give fans access to that content through subscriptions. *Id.* ¶ 17. Those content producers often drive traffic to their channel from their social media sites. That plaintiff is "confused about what constitutes 'reasonable age verification methods'" and is "concerned about the costs of compliance." *Id.* at 19 ¶ 17. FSC and the individual plaintiffs allege that SB 287 violates the First and Fourteenth Amendments because it is an unconstitutional prior restraint and chills protected speech, that it is impermissibly vague, and that it violates the Commerce and Supremacy Clauses.

### B.    Causation & Redressability

The Plaintiffs must show that there is "a causal connection between the injury and conduct complained of" so that the injury is "fairly traceable to the challenged action of the defendant." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). And they must show that it is "likely as opposed to merely speculative that the injury will be redressed by a favorable decision."

*Id.* at 561 (cleaned up). Importantly, a "plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Massachusetts v. E.P.A.*, 549 U.S. 497, 525 (2007) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)); *accord Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 905 (10th Cir. 2012) ("There are . . . several decades of Supreme Court precedent [under which] . . . redressability is satisfied when a favorable decision relieves *an* injury, not every injury."). These two inquiries are bound up with the *Ex parte Young* analysis, because if there is a connection between the Defendants' enforcement of the challenged statute, then there will also be causation and redressability, and vice versa. *See Cressman v. Thompson*, 719 F.3d 1139, 1146 n.8 (10th Cir. 2013) ("[T]here is a common thread between Article III standing analysis and *Ex parte Young* analysis." (citing *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004))). And traceability and redressability themselves "overlap as two sides of a causation coin." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005) (citation omitted).

The Commissioner's involvement in giving effect to the Act is evident from the fact that, if the mDL program was functional for online verification, *some* of the Plaintiffs' injuries here would be lessened (if not entirely remedied). *See* Reply Br. at 12 ("[T]he Commissioner is wrong when he asserts that *all* of Plaintiffs' constitutional injuries derive from an 'inability to access

material without engaging in any verification.'" (quoting Resp. Br. at 40)). The Defendants argue that "*none* of the [Plaintiffs'] alleged injuries are ones that would be redressed if the mDL Program had the functionality to verify age over the internet." Resp. Br. at 40 n.9. But that is not so. In their response to the Defendant's motion to dismiss, the Plaintiffs noted several ways in which the various plaintiffs here have been injured by the lack of a functional compliance mechanism: "Pfeuffer's and Dawson's injuries include the inability to protect themselves from liability given the Act's vagueness and ambiguities, and the technological impossibility of adopting their own 'reasonable age verification methods' within platforms that they do not control." App. at 199 n.2. They also argued that the "Plaintiffs' injuries are, in substantial part, caused by this unconstrained prior restraint on speech that the Commissioner is tasked with constraining," and by his "provision of an mDL program that lacks the technological functionality to be of any use to the Plaintiffs seeking digital passage online." *Id.* at 201 (emphasis omitted). And they argued that this injury would be "redressed by an injunction precluding the Commissioner's administration of an inadequate program *absent substantial improvements* that may be negotiated as the case advances." *Id.* (emphasis added). So some of the Plaintiffs' injuries would at least be mitigated by an mDL program with online functionality—those Plaintiffs could rely on the state-approved method and would not have to risk navigating the vagueness and technical problems posed by the other methods.

True, the Plaintiffs struggled to articulate their requested injunctive relief against the Commissioner in their complaint: there, the Plaintiffs requested an injunction "enjoining the Commissioner . . . from permitting its data files to be downloaded for use by the mDL Program." *Id.* at 37. And in the complaint's Prayer for Relief, the Plaintiffs requested the district court more generally to "[p]reliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the Act." *Id.* at 40. On appeal, the Plaintiffs reassert the points they raised in their motion-to-dismiss briefing, arguing that their injuries, "in part, are <u>caused</u> by the Commissioner's provision of an mDL program that lacks the technological functionality to be of any use to the Plaintiffs seeking digital passage online," and would be "<u>redressed</u> by an injunction precluding the Commissioner's continued administration of the inadequate program *absent substantial improvements*." Op. Br. at 24 (italics added). They propose declaratory relief and an injunction preventing the Commissioner's "continued participation [in the Act] barring improvements to allay the discrete constitutional injury." Reply Br. at 13 n.9.

Of course, the Plaintiffs' preferred and ultimate goal is to strike down the age-verification methods in § 78B-3-1001 as unconstitutional, rather than improve them; they argue that the constitutionally infirm age-verification methods are inseverable from the rest of the Act and that "absent such

15

provision[s]" the Act would be "an outright ban on the constitutionally protected material at issue," rendering the Act wholly unconstitutional. Op. Br. at 24; *see* Reply Br. at 13 ("[T]he 'digitized identification card' provision is so fundamental to the Verification Act as to be inseverable from the remainder.").

But any inconsistencies in the Plaintiffs' articulation of their requested injunctive relief should not change our standing analysis—let's remember that we're still at the motion-to-dismiss stage, and "at this early stage of the proceeding the court should not assume it will be unable to fashion relief that could remedy any constitutional violation found." *Petrella v. Brownback*, 697 F.3d 1285, 1295 (10th Cir. 2012). Indeed, "[e]quitable relief can take many forms." *Id.* At this stage, "[t]he standing inquiry . . . asks only whether the plaintiff has sufficiently alleged a cognizable injury, fairly traceable to the challenged conduct that is likely to be redressed by a favorable judicial decision." *Id.* And here, the Plaintiffs clearly have.

The Plaintiffs' request that the age-verification provisions of SB 287 be declared unconstitutional would also satisfy the "case or controversy" requirement because it would "settl[e] . . . *some* dispute which affects the behavior of the defendant toward the plaintiff." *Nova Health Sys.*, 416 F.3d at 1159 (emphasis added) (cleaned up). Depending on the district court's analysis on remand, a declaration that those provisions were unconstitutional combined with a suitable injunction *would* affect the Commissioner's mDL program and whether it is used for online verification in accordance with SB 287. Such a

declaration would also reduce the threat of private litigants suing the Plaintiffs because, while not binding, "a lower federal court's interpretation of federal law . . . is highly persuasive, and a federal decision that [SB 287 violates the First Amendment] would carry significant weight in [Utah] state courts." *Consumer Data Indus.*, 678 F.3d at 906 n.3. And if we affirmed it, "we may assume future parties that would sue under [SB 287] 'will give full credence' to a decision by this court that the statute is unconstitutional." *Nova Health Sys.*, 416 F.3d at 1163–64 (Briscoe, J., dissenting) (citation omitted). Even the Defendants acknowledge that "a declaratory ruling that the Act is unconstitutional might discourage private parties from bringing suits for damages against FSC's members"—their only quibble is that "this relief has no relationship to the Commissioner." Resp. Br. at 38. But as discussed above, both injunctive and declaratory relief relate to the Commissioner's providing a program that requires significant "improvements to allay the discrete constitutional injury." Reply Br. at 13 n.9.

The importance of declaratory and injunctive relief in this case is buttressed by the fact that at least one individual plaintiff will never be able to seek redress of his constitutional harms and "pursue state and federal constitutional arguments in his . . . defense" to an enforcement action, because he is the viewer or consumer of the targeted speech, not a speaker or publisher who may be sued under the statute. *See Whole Woman's Health*, 595 U.S. at 49. As the Plaintiffs explain, "for the John Doe Plaintiff in this case, there *is* no

17

other hypothetical time, place, suit, or forum in which to assert his rights. As a putative viewer rather than [a content creator or publisher], he is not subject to an enforcement action under the Verification Act and therefore is not able to violate it in order to obtain a forum in which to assert his constitutional claims as defenses." Op. Br. at 34.

Because some form of injunction combined with declaratory relief against the Commissioner would either in part (by improving the age-verification methods to ensure compliance was possible) or entirely (by striking down an inseverable part of the Act) redress the Plaintiffs' injuries, I conclude that the Plaintiffs have shown sufficient causation and redressability for Article III standing.

### C.    Ripeness

The Plaintiffs' claims against the Commissioner are ripe. "The question of whether a claim is ripe for review bears on a court's subject matter jurisdiction under the case or controversy clause of Article III of the United States Constitution." *New Mexicans for Bill Richardson*, 64 F.3d at 1498–99. Because they both focus on the harm asserted, "[s]tanding and ripeness are closely related." *Peck v. McCann*, 43 F.4th 1116, 1133 (10th Cir. 2022) (citation omitted). "But unlike standing, ripeness issues focus not on whether the plaintiff was in fact harmed, but rather whether the harm asserted has matured sufficiently to warrant judicial intervention." *Id.* (cleaned up). "In evaluating ripeness the central focus is on whether the case involves uncertain

18

or contingent future events that may not occur as anticipated, or indeed may not

occur at all." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1097

(10th Cir. 2006) (cleaned up).

The district court held that, "[e]ven assuming that Commissioner

Anderson's connections to the mDL program were sufficient to invoke the *Ex*

*parte Young* exception, Plaintiffs['] claims against Commissioner Anderson are

not ripe." *Free Speech Coal.*, 685 F. Supp. 3d at 1305. I disagree. Here, as in

*Walker*, "[t]he ripeness challenge fails . . . because the Plaintiffs' alleged injury

is already occurring." 450 F.3d at 1098. FSC and the other individual plaintiffs

have amply demonstrated that their injury is already occurring—and is

exacerbated by—the Commissioner's failure to provide a digitized

identification card that functions as contemplated by the Act. *See* § II(A),

*supra*. *See generally* App. at 15–19 (describing injuries to plaintiffs caused by

SB 287 and the state's failure to provide functioning age-verification

mechanisms). That the Plaintiffs' injuries are greater *because* of the digitized

identification card's lack of online functionality does not defeat the Plaintiffs'

claims; rather, it highlights the traceability and redressability of some of their

injuries to the Commissioner. Because these injuries are already occurring and

are not dependent on "uncertain or contingent future events," *Walker*, 450 F.3d

at 1097, the Plaintiffs are already undergoing considerable hardship, *see Peck*,

43 F.4th at 1133.

Finally, this issue is fit for judicial resolution because the facial challenge to SB 287's constitutionality may be decided today. *See id.* Let's not forget that this case presents a First Amendment challenge, where "ripeness inquiries are relaxed . . . due to the chilling effect that potentially unconstitutional burdens on free speech may occasion." *Id.* at 1133–34 (cleaned up). Indeed, "ripeness is seldom an obstacle to a pre-enforcement challenge in this posture, where the plaintiff faces a 'credible threat' of enforcement, and 'should not be required to await and undergo [enforcement] as the sole means of seeking relief.'" *Consumer Data Indus.*, 678 F.3d at 907 (alteration in original) (citation omitted). SB 287 creates a "credible threat" of liability, and the Plaintiffs should "not be required to await and undergo [a civil suit]" to seek relief. *See id.* As discussed above, many of the Plaintiffs voiced fears that they could not, or did not know how to, comply with SB 287, and so have changed their behavior to avoid civil liability.

In sum, the Plaintiffs' claims against the Commissioner are ripe because the Plaintiffs' injuries are already occurring and are exacerbated by the mDL program's lack of online functionality, for which the Commissioner is responsible.

* * *

Because the Commissioner has a sufficient connection with SB 287's enforcement to meet the *Ex parte Young* exception to sovereign immunity, and

20

because the Plaintiffs have Article III standing and their claims are ripe, I respectfully dissent.