## No. 23-4104

*In the*

# UNITED STATES COURT OF APPEALS

*for the*

# TENTH CIRCUIT

FREE SPEECH COALITION, INC.; D.S. DAWSON; JOHN DOE;
DEEP CONNECTION TECHNOLOGIES, INC.; CHARYN PFEUFFER; and
JFF PUBLICATIONS, LLC,

*Plaintiffs-Appellants,*

v.

JESS L. ANDERSON, in his official capacity as THE COMMISSIONER
OF THE UTAH DEPARTMENT OF PUBLIC SAFETY; and
SEAN D. REYES, in his official capacity as THE ATTORNEY GENERAL
OF THE STATE OF UTAH,

*Defendants-Appellees.*

Appeal from the United States District Court for the District of Utah
No. 2:23-cv-00287-District Judge Ted Stewart

### PLAINTIFFS-APPELLANTS' OPENING BRIEF
### ORAL ARGUMENT REQUESTED

| | | |
|---|---|---|
| D. Gill Sperlein | Jerome Mooney | Jeffrey Keith Sandman |
| Law Offices of D. Gill Sperlein | Weston, Garrou & Mooney | Webb Daniel Friedlander LLP |
| 345 Grove Street | 50 West Broadway, #300 | 5208 Magazine St Ste 364 |
| San Francisco, CA 94102 | Salt Lake City, UT 84101 | New Orleans, LA 70115 |
| (415) 404-6616 | 801-364-5635 | (978) 886-0639 |
| gill@sperleinlaw.com | jerrym@mooneylaw.com | jeff.sandman@webbdaniel.law |

Attorneys for *Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................i

TABLE OF AUTHORITIES ............................................................. iii

INTRODUCTION .............................................................................1

JURISDICTIONAL STATEMENT ...................................................3

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................................3

STATEMENT OF THE CASE ...........................................................4

    A.      STATUTORY BACKGROUND ..............................................4

    B.      PROCEDURAL BACKGROUND ............................................5

SUMMARY OF ARGUMENT ...........................................................8

ARGUMENT .....................................................................................9

    A.  DEFENDANTS ARE AMENABLE TO SUIT UNDER EX PARTE YOUNG'S
    EXCEPTION TO SOVEREIGN IMMUNITY. ..........................................11

i.    The Commissioner has "some connection to the enforcement" of the Act.....12

ii.    The Attorney General has "some connection to the enforcement" of the Act.
    ..............................................................................15

    B.  PLAINTIFFS' CLAIMS ARE JUSTICIABLE AS TO THESE DEFENDANTS............22

i.    Plaintiffs have standing. ......................................................22

ii.    Plaintiffs' claims are ripe for adjudication. ...................................27

    C.    WHOLE WOMAN'S HEALTH DOES NOT MEANINGFULLY ALTER THE
    ANALYSIS. .....................................................................29

CONCLUSION ................................................................................35

STATEMENT REGARDING ORAL ARGUMENT ............................................36

CERTIFICATE OF COMPLIANCE ......................................................................37

ATTACHMENT - ORDERS ON APPEAL ..............................................................

ADDENDUM - S.B. 287 ...........................................................................................

## TABLE OF AUTHORITIES

<u>C</u><small>ASES</small>

*303 Creative LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021) ....................................23

*ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) ...............................................28

*Ashcroft v. ACLU*, 542 U.S. 656 (2004).................................................................4

*Bishop v. Oklahoma*, 333 F. App'x 361 (10th Cir. 2009) .....................................10

*Bronson v. Swensen*, 500 F.3d 1099 (10th Cir. 2007).............................................10

*Cache Valley Elec. Co. v. State of Utah Dep't of Transp.*, 149 F.3d 1119 (10th Cir. 1998).......................................................................................................23

*Chamber of Com. of U.S. v. Edmondson,* 594 F.3d 742 (10th Cir. 2010)..............20

*Consumer Data Industry Ass'n v. King*, 678 F.3d 898 (10th Cir. 2012)...........23, 26

*Cressman v. Thompson*, 719 F.3d 1139 (10th Cir. 2013) ......................................10

*Crowson v. Washington Cnty. Utah*, 983 F.3d 1166 (10th Cir. 2020) ...................18

*Dept. of Commerce v. New York*, 139 S. Ct. 2551 (2019)......................................33

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. ___ (2022)...............30

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59 (1978) .............33

*Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012 (D.C. Cir. 1997).....................23

*Fernandez v. Clean House, LLC*, 883 F.3d 1296 (10th Cir. 2018)........................12

*Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2007)...........................................11

*Gomez v. Toledo*, 446 U.S. 635 (1980) .................................................................12

*Hendrickson v. AFSCME Council 18*, 992 F.3d 950 (10th Cir. 2021).10, 15, 16, 17, 18, 31

*Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014) ............................10, 12, 18, 19

*Larson v. Valente,* 456 U.S. 228 (1982) ..................................................................26

*Leavitt v. Jane L.*, 518 U.S. 137 (1996) ..................................................................24

*Loc. 514 Transp. Workers Union of Am. v. Keating*, 358 F.3d 743 (10th Cir. 2004)

.....................................................................................................................25

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .....................................................10

*Mass. v. E.P.A.*, 549 U.S. 497 (2007).....................................................................22

*Nashville, C. & St. L. Ry. v. Wallace*, 288 U.S. 249 (1933)....................................26

*Petrella v. Brownback*, 697 F.3d 1285 (10th Cir. 2012)...........16, 17, 18, 22, 24, 26

*Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818 (10th Cir. 2007) .......11

*Pritchett v. Off. Depot, Inc.*, 420 F.3d 1090 (10th Cir. 2005) ...................................3

*Roe No. 2 v. Ogden*, 253 F.3d 1225 (10th Cir. 2001) .............................................28

*S. Utah Wilderness All. v. Office of Surface Mining Reclamation & Enf't*, 620 F.3d
1227 (10th Cir. 2010) ........................................................................................27

*Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906 (10th Cir. 2008)...............28

*US Magnesium, LLC v. E.P.A.*, 690 F.3d 1157 (10th Cir. 2012) ............................27

*Utah v. Evans*, 536 U.S. 452 (2002).......................................................................33

*Vega v. Jordan Valley Med. Ctr.*, 449 P.3d 31 (Utah 2019) ..................................24

*Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635 (2002)....................11

*WildEarth Guardians v. United States Bureau of Land Mgmt.*, 870 F.3d 1222 (10th
Cir. 2017) ..........................................................................................................27

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) .........................................11

STATUTES

28 U.S.C. § 1291 ...................................................................................3

28 U.S.C. § 1331 ...................................................................................3

Tex. Health & Safety Code § 171.207 ................................................31

Utah Code § 53-3-103 ............................................................................7

Utah Code § 53-3-235 ............................................................................7

Utah Code § 67-5-1 ...................................................................8, 18, 19

Utah Code § 78B-3-1001 and 1002........................................................1

OTHER AUTHORITIES

Akhil Reed Amar, Law Story, 102 HARV. L. REV. 688 (1989) (book review) .......29

Brian Charles Lea, Situational Severability, 103 Va. L. Rev. 735 (2017)..............25

Opinion of the Attorney General of Utah to John T. Nielsen, Commissioner of

    Public Safety, No. 88-36, 1988 WL 409703 (Utah A.G. Dec. 15, 1988) ...........20

Richard H. Fallon, Jr., Constitutional Remedies: In One Era and Out the Other, 136

    HARV. L. REV. 1300 (2023)..........................................................................2, 34

## INTRODUCTION

In March of its 2023 General Session, the Utah Legislature enacted a patently unconstitutional law (Utah Code §§ 78B-3-1001 and 1002-02—the "Verification Act" or "Act") reflecting the same moral panic and dusted-off statutory language that the Supreme Court invalidated several decades ago. The Act places substantial burdens on Plaintiff website operators, content creators, and countless others who use the internet by requiring websites to age-verify every internet user before providing access to non-obscene material that meets the State's murky definition of "material harmful to minors." The twist this time was the Legislature's attempt to shield the law from challenge by removing the most obvious state actors from its enforcement and instead empowering private citizens to do the State's bidding in shutting down access to disfavored material.

Shortly after its effective date, Plaintiffs brought a constitutional challenge to the Act by naming the Attorney General and the Commissioner of the Utah Department of Public Safety as Defendants, alleging that both officials bore the requisite connection to the Act's enforcement and that the constitutional injuries suffered were properly traced to those officials and redressed by relief that the district court was competent to fashion. The district court disagreed—granting the Defendants' motion to dismiss and effectively relegating Plaintiffs to an enforcement purgatory where they must wait patiently to be sued in state court for the opportunity

1

to assert their constitutional claims as defenses there. Never mind that—for one Plaintiff, at least—this affirmative challenge is the only means by which he can act to vindicate his constitutional rights in any posture or any forum, and that for the others, the interim chill on protected speech is unaddressable, the costs undertaken to comply with the Act are irretrievable, and the risk in defying it is taken at the peril of the violator. That was, of course, the Legislature's intent.

This appeal is about far more than Utah's noble but ill-conceived attempt to protect children from online pornography. With no effective means by which to challenge an unconstitutional law, "[r]ights that exist in name will increasingly fall vulnerable to flouting in the absence of political commitments to enforcing them." *See* Richard H. Fallon, Jr., Constitutional Remedies: In One Era and Out the Other, 136 HARV. L. REV. 1300, 1308 (2023). Fortunately, this Court need not strain the reasoning of recent precedents to permit Plaintiffs' constitutional challenge to proceed, because while Utah's efforts to eliminate review were well-built, they weren't airtight.

Plaintiffs have brought a live case and controversy ripe for adjudication against state actors who, per *Ex Parte Young*, 209 U.S. 123 (1908), are appropriate defendants outside the protection of the State's sovereign immunity. The district court erred in concluding otherwise.

2

## JURISDICTIONAL STATEMENT

This Court has subject-matter and appellate jurisdiction to decide Plaintiff-Appellants' appeal from the district court's order granting Defendant-Appellees' motion to dismiss. The Court has subject-matter jurisdiction because Plaintiffs assert claims arising under federal law, *see* 28 U.S.C. § 1331, and because "federal courts always have jurisdiction to consider their own jurisdiction," *Pritchett v. Off. Depot, Inc.*, 420 F.3d 1090, 1093 (10th Cir. 2005). The Court has appellate jurisdiction because the district court's August 1, 2023 order decided all claims by all parties, *see* 28 U.S.C. § 1291, and Plaintiffs filed a timely notice of appeal on August 11, 2023.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1)     Do Defendants have a sufficient "connection to the enforcement" of the challenged statute such that they are amenable to suit under the *Ex Parte Young* exception to state sovereign immunity?

(2)     Have Plaintiffs presented a live case and controversy demonstrating their standing to assert claims against these Defendants, and are those claims ripe?

## STATEMENT OF THE CASE

### A. Statutory Background

The Verification Act[1], codified at Sections 78B-3-1001 and 1002 of the Utah Code, imposes liability upon a "commercial entity[2] that knowingly and intentionally publishes or distributes material harmful to minors[3] on the Internet from a website that contains a substantial portion[4] of such material . . . [where] the entity fails to perform reasonable age verification methods to verify the age of an individual attempting to access the material." That liability includes "damages resulting from a minor's accessing them material, including court costs and reasonable attorney fees[.]" *Id.* The Act includes much of the same statutory language that the

---

[1] The complete statutory text is set forth in the Addendum to this Brief.

[2] A "commercial entity" includes every "legally recognized entit[y]" from the largest corporation down to the smallest "sole proprietorship."

[3] "Material harmful to minors" is defined in an effort to track the Supreme Court's modified-for-minors *Miller* Test and includes "(a) any material that the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest; (b) material that exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated display or depiction of [certain body parts (including the 'nipple of the female breast') or sexual acts (including 'touching . . . of nipples, breasts, [or] buttocks')] in a manner patently offensive with respect to minors; and (c) the material taken as a whole lacks serious literary, artistic, political, or scientific value for minors."

[4] "Substantial portion" means "more than 33-1/3% of total material on a website, which meets the definition of 'material harmful to minors' as defined[.]"

Supreme Court found vague, overbroad, and unable to survive strict scrutiny nearly

two decades ago. *See Ashcroft v. ACLU*, 542 U.S. 656 (2004).

But as this appeal concerns not the constitutional merits of the law itself but

Plaintiffs' right to challenge those merits in an anticipatory suit in federal court,

most relevant here is the Act's definition of "reasonable age verification methods,"

which extends safe harbor to those websites requiring proof of age via one of three

mechanisms: (1) "use of a digitized identification card" through "a state-approved

application" that facilitates the download of a "data file from a state agency" which

contains "all of the data elements visible on the face and back of a license or iden-

tification card and displays the current status of the license or identification card";

(2) "an independent, third-party age verification service that compares the personal

information entered" by the user against a "commercially available database, or ag-

gregate of databases, that is regularly used by government agencies and businesses

for the purpose of age and identity verification"; or (3) "any commercially reasona-

ble method that relies on public or private transactional data" to verify the user's

age. Utah Code § 78B-3-1001(2) & (9).

## B. Procedural Background

Plaintiffs are a collection of non-profits, for-profits, and individuals who rely

on the internet for communication, both as providers and recipients of First

Amendment-protected materials. Together they filed suit to challenge the

constitutionality of the Act, seeking declaratory and injunctive relief from violations of the First and Fourteenth Amendments to, and the Commerce and Supremacy Clauses of, the United States Constitution. They named two Defendants in the Complaint—the Commissioner of the Utah Department of Public Safety (DPS) and the Attorney General (AG)—and moved for a preliminary injunction immediately upon initiating the case. Contemporaneous with the preliminary injunction briefing, Defendants moved to dismiss the Complaint for lack of subject matter jurisdiction based on what they asserted to be (1) Defendants' insufficient "connection to the enforcement" of the challenged law under the *Ex Parte Young* exception to state sovereign immunity, and (2) Plaintiffs' failure to establish a live case or controversy sufficient to satisfy Article III.[5]

Plaintiffs opposed the motion, identifying the respective connections between the Defendants and enforcement of the statutory scheme. For the Commissioner, that nexus comes via his administration of the State's Driver License Division (DLD), *see* Utah Code § 53-3-103, which manages the Mobile Driver's License (mDL) Program[6] that provides the State's only "digitized identification

---

[5] Defendants vacillated between framing their challenge as one grounded in "ripeness" and "standing." *Compare* Appx. 123 *with* Appx. 126-127.

[6] *See* Utah Code § 53-3-235 (requiring DLD to "establish a process and system for an individual to obtain an electronic license certificate or identification card"). Details of the resulting mDL program are available on the DPS website. *See* Website:

card." *See* Utah Code § 78B-3-1001(2). When used to verify a user's age, that digital proof-of-identity is the only State-guaranteed "reasonable age verification method" authorized by the Verification Act, but the Program does not yet provide for the *online* verification necessary for the card to be of any use to putative providers and viewers of "material harmful to minors" online. Other qualifying methods—to the extent they exist at all[7]—are supplied by private parties without restriction as to *whom* they must serve, *how* they must do so, or *how much* they may charge for their services.

The Attorney General, meanwhile, is connected to the Act's enforcement by virtue of his unique role under Utah law. The Utah Constitution directs him to serve as "the legal adviser of the State officers" and to "perform such other duties as provided by law." Utah Const. Art. VII, § 16. Those other duties are vast; among them, the Attorney General is directed to:

- "prosecute or defend all causes to which the state or any officer, board, or commission of the state in an official capacity is a party, and take charge, as attorney, of all civil legal matters in which the state is interested[.]" Utah Code § 67-5-1(1)(b);

---

Utah Dept. of Public Safety, "Utah mDL FAQs," *available at*: https://dld.utah.gov/mdlfaqs/.

[7] Briefing on Plaintiffs' motion for preliminary injunction reveals how Utah simply hasn't provided the legislative flexibility to accommodate the few operational age verification technologies, which plainly do not satisfy the definition of "reasonable age verification methods."

- "give [his] opinion in writing and without fee, when required, upon any question of law relating to the office of the requester . . . to the Legislature or either house" or "to any state officer, board, or commission[.]" Utah Code § 67-5-1(1)(g) ; and

- "submit a written report to [the Legislative Management Committee; the Judiciary Interim Committee; and the Law Enforcement and Criminal Justice Interim Committee] that summarizes any lawsuit or decision in which a court or the Office of the Attorney General has determined that a state statute is unconstitutional or unenforceable[.]" Utah Code § 67-5-1(1)(u)(i)).

On August 1, without the benefit of oral argument, the district court granted Defendants' motion to dismiss—concluding that Plaintiffs failed to demonstrate the connection between the Defendants and the Verification Act as required by *Ex Parte Young*. The court also suggested without analysis that Plaintiffs' claims had not ripened and wove into its *Ex Parte Young* analysis its concerns about redressability that are properly analyzed as part of an inquiry into Article III standing. *See* Appx. 256-58. Although the court granted leave to amend, its opinion suggested a legal bar to relief rather than a pleading deficiency curable with additional factual allegation—prompting Plaintiffs to pursue this appeal.

## SUMMARY OF ARGUMENT

The district court erred in granting Defendants' motion to dismiss in several respects. First, Plaintiffs properly pleaded that each Defendant bore "some connection to the enforcement" of the Verification Act sufficient to bring them within the *Ex Parte Young* exception to sovereign immunity. Both Defendants "give effect" to the law, albeit in different ways—the Commissioner via his provision of the

State's only "digitized identification card" that, but for its technological inadequacy, would constitute a "reasonable age verification method" compliant with the Act, and the Attorney General by virtue of his supervisory role within the Utah executive branch. In concluding otherwise, the district court failed to follow this Court's binding precedent.

Second, and for substantially similar reasons, Plaintiffs properly pleaded that their constitutional injuries were traceable to these Defendants, redressable by a favorable decision, and otherwise ripe for review such that Article III was satisfied.

Finally, although the Supreme Court's decision in *Whole Woman's Health* certainly merits discussion, it did not alter the *Ex Parte Young* and justiciability analyses required for a decision in this case, as its core holdings flowed from unique legislative wrinkles that are not at issue here.

## ARGUMENT

In ruling on Defendants' motion to dismiss, the district court was the latest to have blended the *Ex Parte Young* and standing inquiries *en route* to a determination as to its jurisdiction to proceed. At bottom, those analyses concern the same core question.

Pursuant to the *Ex Parte Young* exception to sovereign immunity, state officers sued in their official capacity must "have some connection with the enforcement" of a challenged provision. *See* 209 U.S. at 157. Article III, meanwhile,

9

demands that a plaintiff have standing to assert her claims, which requires an injury, fairly traceable to the defendants, that is redressable (at least in part) by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The latter two criteria demand a "a meaningful nexus" between the defendants and the asserted injury. *See Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1111–12 (10th Cir. 2007)). Because that nexus typically demands some authority by which the defendants may enforce a statute, it is "related to whether, under *Ex Parte Young,* they are proper state officials for suit." *Id.* (quoting *Cressman v. Thompson*, 719 F.3d 1139, 1146 n. 8 (10th Cir. 2013)). Although some courts still approach the *Ex Parte Young* and Article III standing inquiries independently, they have effectively converged in this Court:

> [T]he necessary connection between the state defendant and the subject of the suit is the common denominator of two separate inquiries: first, whether there is the requisite causal connection between the defendant's responsibilities and any injury that the plaintiffs might suffer, such that relief against the defendants would provide redress [Article III standing]; and second, whether our jurisdiction over the defendants is proper under the doctrine of *Ex Parte Young* which requires some connection between a named state officer and enforcement of a challenged state law.

*Bishop v. Oklahoma*, 333 F. App'x 361, 364 n.5 (10th Cir. 2009) (brackets, ellipses, and citation omitted). *See also Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 967 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 423 (2021) (acknowledging same).

10

## A. Defendants are amenable to suit under *Ex Parte Young*'s exception to sovereign immunity.

The Eleventh Amendment constitutionalizes the doctrine of state sovereign immunity, and case law has extended it to include "suit[s] against a state official in his or her official capacity" because such suits are "no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). But the immunity is not absolute, and under the exception carved out in *Ex Parte Young*, a plaintiff may sue individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law for which the plaintiff seeks only prospective relief. *See Ex Parte Young*, 209 U.S. at 159-60; *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). To satisfy this exception, the named state official "must have some connection with the enforcement" of the challenged statute. *Ex Parte Young*, 209 U.S. at 157. Whether that connection "arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *Id.* Thus, no "'special connection' to the unconstitutional act or conduct" is required. *See Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007). *See also Finstuen v. Crutcher*, 496 F.3d 1139, 1151 (10th Cir. 2007) ("So long as there is such a connection, it is not necessary that the officer's enforcement duties be noted in the act.").

In the Tenth Circuit, to "enforce" a law simply means to "give effect" to it. *Prairie Band*, 476 F.3d 828 & n.15. Thus, a state official is a proper defendant if

he is "responsible for general supervision of the administration" of a statutory scheme by other officials, even if "not specifically empowered to ensure compliance" with it, so long as the official "clearly ha[s] assisted or currently assist[s] in giving effect to the law." *Kitchen*, 755 F.3d at 1204 (citations omitted). Because state sovereign immunity is an affirmative defense, plaintiffs are not required to anticipate or plead around it. *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

### i.    The Commissioner has "some connection to the enforcement" of the Act.

Considering claims brought against the Commissioner, the district court acknowledged the appropriate standard by which to determine whether a state official bears the requisite connection. *See* Appx. 255-56 ("The Tenth Circuit has applied the *Ex Parte Young* exception where '[d]efendants, although not specifically empowered to ensure compliance with the statute at issue, clearly have assisted or currently assist in giving effect to the law.'") (quoting *Prairie Band*, 476 F.3d at 828 & n.15). The court noted that the *Prairie Band* Panel "applied the *Ex Parte Young* exception where the defendants were all state officials who, in one way or another, had some connection with the statute at issue." *Id.* But unlike that case, the court below reasoned that "Commissioner Anderson's connection with S.B. 287 is only that he oversees the mDL program"—a "connection [that] is simply too attenuated to provide the connection required by *Ex Parte Young*."

It's an unsatisfying *ipse dixit* from the district court—offered without explanation, reasoning, or citation beyond *Ex Parte Young* itself. Yet the Commissioner's connection is not nearly so attenuated as the district court suggested. He is statutorily tasked with administrating the Driver License Division that manages the mDL Program that provides the State's only "digitized identification card" and thus the only State-assured "reasonable age verification method" compliant with the Act. *See* Utah Code § 78B-3-1001(2). Proof of age via "digitized identification card" is not just a legislatively-designed "fast lane" to regulated content on the internet; it might in fact be the *only* lane—as the Legislature has so rigidly defined the "reasonable age verification methods" that existing private age-verification vendors are almost certainly out of compliance with the demands of Utah law.[8]

It is no small irony, then, that the shortcomings of the Commissioner's mDL program are what *saved* him from defending this lawsuit. The district court reasoned that because "the mDL Program's online verification is not currently operative" as its "functionality is currently limited to an in-person scan" of little use in providing digital passage on the internet, "it can hardly be said that Commissioner Anderson clearly has assisted or currently assists in giving S.B. 287 effect." Appx.

---

[8] That Defendants' motion to dismiss is impacted by the availability of these other options reveals how Defendants' assertion of sovereign immunity is, at best, premature.

256. Put differently, the court concluded that because the mDL program fails to provide the functionality clearly contemplated by the Verification Act, the state official responsible for that program lacks the required connection to the Act.

The result is as illogical as it is untenable—providing immunity to officials who, by failing to perform their assigned duties, *exacerbate* the constitutional problem that they were tasked with mitigating. A state may not outsource to private third parties the duty of administering a prior restraint on protected speech. *See* Appx. 33 (¶ 49-51). The Commissioner's dereliction of duty is scarcely any different than a town permit officer who declines to make available a required parade permit and instead refers petitioning parties to the diner down the road that provides and processes applications at its own whim and for whatever fees it decides to charge.

Indeed, *Prairie Band* itself reveals the flaw in the district court's logic and supports the axiom that an official may not evade a constitutional challenge by *failing* to perform those duties that would mitigate the constitutional harm and provide the *Ex Parte Young* "connection." In *Prairie Band*, a Kansas Indian tribe sued (among others) the Director of Vehicles and the Superintendent of the Highway Patrol, seeking to enjoin the State's practice of failing to recognize the Nation's vehicle registrations and titles outside its Reservation. 476 F.3d at 820. Because the Director of Vehicles "manages vehicle registrations and titles and supervises

14

vehicle reciprocity" while the Superintendent of the Highway Patrol "enforces traffic and other laws of the State related to highways, vehicles, and drivers of vehicles," both officials "clearly have assisted or currently assist in giving effect to the law" and thereby "satisfied the 'some connection' requirement of *Ex Parte Young.*" *Id.* at 828 & n.15.

Just as the Director of Vehicles in *Prairie Band* "gave effect" to the Superintendent's traffic enforcement practices, so, too, does the Commissioner "give effect" to the Verification Act by ostensibly (but not *actually*) providing a critical channel for constitutionally-protected speech that was clearly contemplated by the legislative scheme in this case. *Prairie Band* and sound logic require reversal on this ground alone.

### ii.   The Attorney General has "some connection to the enforcement" of the Act.

Whereas the district court deemed the Commissioner's duties too *attenuated* from the statutory enforcement under *Ex Parte Young*, the Attorney General's duties were instead reasoned to be too *general*. "Plaintiffs point only to the Attorney General's generalized responsibilities to enforce the laws of the state and provide written opinions to the legislature"—which the court considered to be "general enforcement powers [] not sufficient to establish the connection needed to involve the *Ex Parte Young* exception[.]" Appx. 254 (citing *Hendrickson*).

15

This Court has recognized, however, that even these "general" duties of an attorney general may be sufficient to establish the requisite *Ex Parte Young* connection. In *Petrella v. Brownback*,[9] students and parents brought a constitutional challenge to a Kansas law that, aiming to mitigate wealth-based disparities among school districts, restricted the allocation of local property taxes to fund the plaintiffs' district. 697 F.3d 1285, 1290-91 (10th Cir. 2012). Plaintiffs named various state officials in the suit—including the Kansas Attorney General, who contended that plaintiffs lacked standing insofar as they could not identify "any specific action on Appellees' part that has caused them harm." *Id.* at 1293. This Court flatly "reject[ed] this argument," noting that "[i]t cannot seriously be disputed that the proper vehicle for challenging the constitutionality of a state statute, where only prospective, non-monetary relief is sought, is an action against the state officials responsible for the enforcement of that statute," nor that "the Attorney General of the state of Kansas [has] responsibility for the enforcement of the laws of the state" under Kansas constitutional and statutory law. *Id.* at 1293-94.

---

[9] Although the *Petrella* Panel primarily analyzed the enforcement connection under the rubric of standing rather than sovereign immunity, (1) it cited *Ex Parte Young* in its determination, *see* 697 F.3d at 1294; (2) this Court has previously analyzed it *en route* to its *Ex Parte Young* determination, *see Hendrickson*, 992 F.3d at 967; and (3) the district court likewise analyzed it in the same fashion here, *see* Appx. 252-53.

The district court below relied on *Hendrickson* to distinguish *Petrella* and, thereby, the instant case. But the *Hendrickson* Court examined an officer's connection to a statute that expressly divested him of supervisory authority while placing that authority squarely with state actors who *were* amenable to suit. *See* 992 F.3d at 966. That case involved a challenge to a state statute that appointed a union as the exclusive representative for the employees in a bargaining unit and vested enforcement power in the Public Employee Labor Relations Board ("Board") that consisted of three members who, although appointed by the governor, would be "free from the executive's control" and insulated from removal. *Id.* The Court reasoned that the plaintiff's challenge to the statute was properly addressed to the *Board*—not the governor or attorney general who were specifically dispossessed of enforcement authority. *Id. Petrella* was deemed inapposite, as there was "no indication the statutory provisions at issue fell outside the scope of these general enforcement powers" of the governor and attorney general in that case. *Id.* at 968 (discussing *Petrella*).

The district court relied on this same distinction drawn in *Hendrickson*:

> [S]ince the statute in *Hendrickson* vested enforcement power in an independent body, the court found that the plaintiff's reliance on *Petrella* unavailing. The same result is warranted here. While the Attorney General has a number of general duties, S.B. 287 vests enforcement authority in private citizens, not the Attorney General. As such, the *Ex Parte Young* exception does not apply and *Petrella* does not dictate a different result.

17

Appx. 253. But that distinction holds no water here. Unlike the challenged law in *Hendrickson*, nothing in the Verification Act expressly precludes the involvement of the Attorney General, whose nondisplaced "general" duties *Petrella* recognized as providing the requisite "connection" under *Ex Parte Young*.[10] Moreover, those assigned the <u>primary</u> enforcement role under the Verification Act are not other government actors amenable to affirmative challenge (as in *Hendrickson*), but putative private litigants who cannot be haled into court to defend the constitutionality of the law. Finally, even if there *were* conflict between the *Petrella* and *Hendrickson* holdings, it is the earlier-in-time published decision—here, *Petrella*—that governs. *See Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1188 (10th Cir. 2020).

Beyond requiring the Attorney General to "take charge" of civil legal matters in which the State is interested, *see* Utah Code § 67-5-1(1)(b), Utah law also requires the AG to "give [his] opinion in writing and without fee" when requested by the "the Legislature or either house" or "any state officer, board, or commission[.]" Utah Code § 67-5-1(1)(g). This very provision was found sufficient to render the Utah Attorney General a proper *Ex Parte Young* defendant in *Kitchen v. Herbert*, a case the district court below relegates to a footnote. *See* Appx. 254 n.26

---

[10] The same distinction separates this case from *Whole Woman's Health* (discussed *infra* p. 30-32).

(discussing *Kitchen*, 755 F.3d 1193 (10th Cir. 2014)). Plaintiffs in that case included a same-sex couple who had married in Iowa, lived in Utah, and wanted to file a joint tax return prohibited because Utah law did not recognize their out-of-state marriage. *Id.* at 1203. This Court allowed their claims against the Attorney General to proceed, recognizing that "[a]lthough the Utah State Tax Commission is charged in the first instance with the duty to administer and supervise the tax laws of the state, the Attorney General in his constitutional role as the legal adviser of the State officers[] is required by statute to offer his opinion in writing to any state officer, board, or commission"—*including* the Tax Commission. *Id.* (internal quotation marks, citations, and ellipses omitted).

The district court distinguished *Kitchen* by stressing that the nexus came by way of the AG's "actual exercise of supervisory power" and "authority to compel compliance" from those officers tasked with recognizing out-of-state marriages. *See* Appx. 254 n.24 (discussing *Kitchen*). But that "exercise of supervisory power" and "authority to compel compliance" is no less pronounced here, where the Attorney General is likewise "required by statute to offer his opinion in writing to any state officer, board, or commission"—*including* the Department of Public Safety. Indeed, a division of the Attorney General's Office even "serves as agency counsel to the Utah Department of Public Safety on a variety of matters such as law enforcement, peace officer certification, driver licensing, criminal history records,

fire prevention, emergency response, forensics and highway safety."[11] As in *Kitchen*, the Attorney General considers its opinions to the Commissioner "authoritative for the purposes of the agency requesting it." *See* Opinion of the Attorney General of Utah to John T. Nielsen, Commissioner of Public Safety, No. 88-36, 1988 WL 409703, at *1 (Utah A.G. Dec. 15, 1988). *See also Kitchen,* 755 F.3d at 1203 (referring to identical language in AG opinion letter to Tax Commissioner as a basis for finding supervisory authority over those officials). And as in *Kitchen*, the Attorney General could direct the Commissioner to administer the mDL program in ways that would mitigate or eliminate the constitutional harms imposed by the Verification Act.

Finally, the district court cited *Chamber of Com. of U.S. v. Edmondson* to support its decision. *See* Appx. 253-54 (citing *Edmonson*, 594 F.3d 742 (10th Cir. 2010)). That case concerned a preemption challenge to parts of an Oklahoma statute that, respectively, (1) required businesses to use a particular online program (called Basic Pilot) to verify the work authorization status of their employees on pain of debarment from contracting with Oklahoma public employers (Section 7(B)), and (2) made it an unlawful discriminatory practice for an employer to terminate an authorized worker while retaining another known to be *un*authorized

---

[11] Website: Utah Office of the Attorney General, "Highways &Utilities," *available at:* https://attorneygeneral.utah.gov/about/dept/civil/hu/.

(Section 7(C)). *Id.* at 750. Although the Attorney General insisted that he had "no power to enforce" Section 7(B), this Court disagreed, noting that an injunction would prevent him "from inserting into such contracts a provision requiring use of Basic Pilot" and "from filing lawsuits or defending against suits on the basis" of that statutory section. *Id.* at 758; *see also id.* at 760 (referring to its standing analysis to support its *Ex Parte Young* conclusion). As for Section 7(C), however, the *Ex Parte Young* exception did not apply, as the plaintiffs cited only to the provision of Oklahoma anti-discrimination law authorizing the AG to vindicate the rights of victims of *housing* discrimination. *See id.*

Rather than consider the Panel's analysis of Section 7(B), the district court suggested that it was *Edmonson*'s reasoning as to Section 7(C) that governs here, with that case "stand[ing] for the proposition that Eleventh Amendment immunity applies when the law at issue does not provide the Attorney General with the power to enforce it." *See* Appx. 254. But there can be no serious dispute that an officer "need not have a 'special connection' to the allegedly unconstitutional statute" or that the officer's enforcement duties need not "be noted in the act"—as *Edmonson* itself tells us. *Id.* at 760 (citation omitted). Had the plaintiffs pointed to the AG's authority, however general, to aid in the enforcement of Section 7(C), every indication is that they would have survived the motion to dismiss. *Edmonson* is, at

21

best, a case of plaintiffs' failing to connect the dots—*not* one denying the constellation hidden within them. And *here*, that constellation was made plain.

## B. Plaintiffs' claims are justiciable as to these Defendants.

The district court's *Ex Parte Young* analysis incorporated lines of inquiry usually reserved to assess a plaintiff's *standing* to sue. It likewise suggested that Plaintiffs jumped the gun by bringing unripe claims rooted in speculative harms that haven't yet materialized. These justiciability challenges are addressed in turn.

### i.    Plaintiffs have standing.

The federal judicial power extends only to "cases" and "controversies." U.S. Const. Art. III. And for a case to be justiciable, it must involve "questions presented in an adversary context and . . . capable of resolution through the judicial process." *Petrella*, 697 F.3d at 1292–93 (quoting *Mass. v. E.P.A.*, 549 U.S. 497, 516 (2007)). "The three requirements of Article III standing—injury-in-fact, causation, and redressability—ensure that the parties to any litigation have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" *Petrella*, 697 F.3d at 1293 (quoting *Mass. v. EPA*, 549 U.S. at 517). On a motion to dismiss, a plaintiff's "burden in establishing standing is lightened considerably." *Id.* at 1292.

To the extent that standing was even at issue in the district court's order of dismissal, it was only the latter two elements—causation and redressability—that might have impacted the decision. "Causation does not require a plaintiff to limit a suit to only the most culpable defendants" so long as the injury is "fairly traceable to those defendants." *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1175 (10th Cir. 2021), *rev'd on other grounds,* 600 U.S. ___ (2023) (internal quotation marks omitted). Redressability, meanwhile, simply demands that "a favorable judgment would meaningfully redress the alleged injury." *Id.* The requirements are closely related: Where an injury is redressed by a remedy impacting a defendant, that injury usually can be said to have been caused by that defendant, too. *See, e.g., Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997) ("Typically, redressability and traceability overlap as two sides of a causation coin[.]") (quoted in *Cache Valley Elec. Co. v. State of Utah Dep't of Transp.*, 149 F.3d 1119, 1123 (10th Cir. 1998)).

A judicial decree declaring the Act unconstitutional and an injunction precluding Defendants from participating in its enforcement would spare Plaintiffs from at least some of the harm caused by the Act. No more is required. *See Consumer Data Industry Ass'n v. King*, 678 F.3d 898 (10th Cir. 2012) (acknowledging that a plaintiff need not show "complete redressability").

Start with the injunctions. For reasons discussed *supra*, Plaintiffs' injuries, in part, are <u>caused</u> by the Commissioner's provision of an mDL program that lacks the technological functionality to be of any use to the Plaintiffs seeking digital passage online and <u>redressed</u> by an injunction precluding the Commissioner's continued administration of the inadequate program absent substantial improvements. *See Petrella*, 697 F.3d at 1295 ("Equitable relief can take many forms, and at [the motion to dismiss] stage of the proceeding the court should not assume it will be unable to fashion relief that could remedy any constitutional violation found."). Even those constitutional injuries *unrelated* to the State's failure to assure a means of accessing constitutionally-protected material online would be redressed by an injunction here: Because the "reasonable age verification methods" provision of the Act is inseverable from the rest of the Act that, absent such provision, could create an outright ban on the constitutionally protected material at issue, the Act cannot survive unless the State's "digitized identification card" withstands scrutiny, as well.[12] *See Loc. 514 Transp. Workers Union of Am. v. Keating*, 358 F.3d

---

[12] The severability question in this case is a particularly easy one to answer. "Severability [of a state statute] is of course a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). The Utah Supreme Court "look[s] to legislative intent," which requires asking "whether the legislature would have intended to enact the statute with the stricken provision severed." *Vega v. Jordan Valley Med. Ctr.*, 449 P.3d 31, 37 (Utah 2019). In this case, the age-verification scheme depends on the State's provision of the "digitized identification card" without which the Act would

743, 750 (10th Cir. 2004) (conferring standing in a preemption challenge to portions of the Oklahoma Constitution that caused plaintiffs no distinct harm where relief might include invalidation of the harm-inducing provisions if deemed inseverable from the preempted provisions). *See also generally* Brian Charles Lea, Situational Severability, 103 VA. L. REV. 735, 758 (2017) (noting that "severability doctrine is most likely to impact the Article III standing analysis" in cases like this, where "(1) a litigant seeking a benefit necessarily relies on a provision creating the possibility of that benefit; (2) another provision withholds, or authorizes the withholding of, the requested benefit; (3) the benefit-seeking litigant challenges the second provision; and (4) the second provision arguably is inseverable from the first provision").

So, too, are Plaintiffs' injuries at least partially <u>caused</u> by the Attorney General and <u>redressed</u> by an injunction precluding *his* role in the Act's enforcement. *Edmonson* provides a thorough analysis—conferring standing in plaintiffs' suit against the Attorney General even as to the statutory section for which the *Ex Parte Young* exception was deemed not to apply. *See* 594 F.3d at 757-59 (finding standing where harms "will likely be 'reduced to some extent' by an injunction

---

effectively outsource to private third parties the duty of administering the prior restraint on protected speech. The Utah Legislature cannot be presumed to be so cavalierly dismissive of our First Amendment.

running against the Attorney General"). *Petrella* provides similar support—reject-ing defendants' contention that a plaintiff must identify a "specific action" of de-fendants that caused him harm and acknowledging the potential for "meaningful relief under a variety of scenarios," including a severability finding. *See* 697 F.3d at 1293.

Even a declaration[13] that the Verification Act is null and void would provide the mere modicum of relief required here. *See King*, 678 F.3d at 902 (noting that a plaintiff need show only that a favorable decision would redress "*an* injury," not "*every* injury") (quoting *Larson v. Valente,* 456 U.S. 228, 243 n. 15 (1982). The *King* Panel even recognized, for purposes of redressability, that a favorable deci-sion against the Attorney General would inure to the benefit of the plaintiff in suits brought by private third parties in state court under the challenged statute—*pre-cisely* the circumstances at issue here. *See id.* at 906 n.3 ("Although a lower federal court's interpretation of federal law is not binding in state court, it is highly persua-sive, and a federal decision [that the law is preempted] would carry significant weight in New Mexico state courts."). And *King* was no outlier: Again and again, this Court has acknowledged that a decision likely to induce or inhibit third party

---

[13] A controversy justiciable if presented in a suit for injunction is equally justicia-ble in a suit for declaratory relief. *See Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 906 (10th Cir. 2012) (citing *Nashville, C. & St. L. Ry. v. Wallace*, 288 U.S. 249, 264 (1933)).

action is sufficient for redressability. *See, e.g., WildEarth Guardians v. United States Bureau of Land Mgmt.*, 870 F.3d 1222, 1232 (10th Cir. 2017) (reasoning that "the legal theory and the standing injury need not be linked as long as redressability is met"); *US Magnesium, LLC v. E.P.A.*, 690 F.3d 1157, 1164-1167 (10th Cir. 2012) (concluding that company had standing to challenge an EPA rule directing Utah to revise its State Implementation Plan under the Clean Air Act where invalidating the rule "would significantly increase the chances of action by Utah" favorable to the company); *S. Utah Wilderness All. v. Office of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1233–34 (10th Cir. 2010) (concluding that aesthetic and recreational environmental injuries conferred standing to challenge agency decision on whether the mining company's time window to commence mining had expired). The Supreme Court has done the same. *See infra* p. 33.

> ## ii.   Plaintiffs' claims are ripe for adjudication.

The district court reasoned that Plaintiffs' claims, at least as to the Commissioner, were not ripe where the mDL program does not yet provide for online verification and Plaintiffs are left to "speculate" that the private entity through which a functional digitized identification card will one day be offered may not choose to do business with covered entities or charge constitutionally permissible fees for use of its product. *See* Appx. 256 (citing Appx. 33 ¶ 50). But the court did not so much

*examine* whether the claim was ripe than simply *assert* that it wasn't. It cited no legal standard, provided no supporting authority, and offered no analysis whatsoever.

Of course, a mere "contingency, in and of itself, is not sufficient to defeat ripeness." *Roe No. 2 v. Ogden*, 253 F.3d 1225, 1231 (10th Cir. 2001). And where a "a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *ACLU v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999). *See Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 910 (10th Cir. 2008) (denying defendant's argument that challenge to state law was not ripe where defendant official had not yet denied plaintiff's application but was "arguably precluded" from doing so under challenged statute). Particularly where First Amendment rights are at stake, uncertainty as to whether, when, and how a critical component of statutory architecture will function is not a serious roadblock *en route* to a resolution, as "customary ripeness analysis is relaxed somewhat where a facial challenge, implicating First Amendment values, is brought." *Johnson*, 194 F.3d at 1155 (quotation marks and ellipses omitted).

Anyway, uncertainty as to whether the mDL program, once fully functional, will "do business with covered websites" and charge no more than

"constitutionally permissible fees" is, for purposes of this appeal, beside the point.[14] *See* Appx. 256 (quoting Appx. 33 ¶ 50). Every day that the Commissioner fails to perform his duty to administer an mDL program suitable for online verification as contemplated by the Verification Act is another day in which he exacerbates the constitutional injury that he was tasked with mitigating. Plaintiffs' claims against him were ripe the moment the Verification Act became effective—if not sooner.

**C. *Whole Woman's Health* does not meaningfully alter the analysis.**

This Court's precedents afford Plaintiffs the opportunity to pursue their claims against Defendants in this case. But perhaps recognizing as much, Defendants argued in the court below that recent Supreme Court precedent upended the

---

[14] Although the district court ignored the primary failure by which the Commissioner is contributing to the injury here, he is similarly mistaken to suggest that a challenge to an unconstrained prior restraint on speech ripens only once those lack of constraints are abused. As Professor Akhil Amar has noted:

> [R]ipeness obviously turns on one's conception not of article III, but of the substantive interests asserted. A first amendment absolutist like Hugo Black and a balancer like Felix Frankfurter will predictably disagree about whether a given anticipatory challenge to a law allowing prior restraint in certain specified circumstances is ripe because the absolutist deems various facts that have not yet materialized irrelevant—prior restraint is always impermissible—whereas a balancer might find those facts dispositive. *But this is a disagreement about the meaning of the first amendment, and not about article III.*

Akhil Reed Amar, Law Story, 102 HARV. L. REV. 688, 718 n.155 (1989) (book review) (emphasis added).

applecart. Although the district court barely addressed it, *Whole Woman's Health* in fact *affirms* this Court's jurisprudence in several critical ways. *See* 595 U.S. 30 (2021). It appears this case is this Court's first occasion to consider the implications of *Whole Woman's Health v. Jackson* on its jurisprudence.

*Whole Woman's Health* involved a constitutional challenge brought by a collection of reproductive-health providers, doctors, and reproductive-rights advocates against numerous government officials concerning their enforcement of Texas S.B. 8 (dubbed the "Heartbeat Act"), which created a private cause of action empowering "any person" to sue a provider or other person who performs, or aids or abets, a post-heartbeat abortion. As the statute was enacted before the Supreme Court ended a half-century of constitutionally protected abortion rights in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. ___ (2022), it reflected an effort to insulate a then-unconstitutional abortion ban from affirmative challenge while creating a "bounty" for private attorneys general to do the State's bidding. The Supreme Court granted certiorari before judgment and, on expedited briefing and argument, rejected the plaintiffs' offensive claims against state court judges, court clerks, and the Texas Attorney General, while allowing them to proceed as to the "executive licensing official[s] who may or must take enforcement actions against the petitioners if they violate the terms of Texas's Health and Safety Code, including S.B. 8." *See Whole Woman's Health*, 595 U.S. at 45-46. Because the

30

legislature had provided that S.B. 8 "may not be construed to . . . limit the enforce-ability of any other laws that regulate or prohibit abortion," the "exclusive private enforcement" language that stripped the Attorney General of enforcement authority did not likewise reach licensing officials whose authority included, *e.g.,* "'tak[ing] an appropriate disciplinary action against a physician who violates' . . . Texas stat-utory law that includes S. B. 8." *Id.* at 46 (quoting Tex. Health & Safety Code § 171.207(a) (directing that S.B. 8 must be "enforced exclusively through [] private civil actions" and that "[n]o enforcement . . . may be taken or threatened by this state, a political subdivision, a district or county attorney, or an executive or ad-ministrative officer or employee of this state or a political subdivision").

The district court misapplied *Whole Woman's Health* at nearly every turn. Its first error was likening the Attorney General's duties in this case to those in *Whole Woman's Health*, where the Texas AG was expressly forbidden by S.B. 8 from participating in its enforcement. Whatever the AG's general duties might have been, they were superseded by the specific statute that forbade *any* Attorney General enforcement whatsoever. In that sense, *Whole Woman's Health* was like *Hendrickson*, discussed *infra* p. 17-18, where the Board tasked with the statutory enforcement authority was expressly insulated from supervision of the Governor or Attorney General. *See* 992 F.3d at 966. *Whole Woman's Health* teaches that

31

perhaps the Utah Legislature *could* have severed the connection between the AG's
duties and the Verification Act . . . but it didn't.

Next, incorporating aspects of standing analysis into its *Ex Parte Young* in-
quiry, the district court insisted that "the potential to ward off future suits is not
sufficient" to show redressability—directly contradicting this Court's decision in
*King*, 678 F.3d at 906 n.3. *See* Appx. 257. It suggested that *Whole Woman's
Health* "rejected a similar argument" when it denied petitioners' claim that "en-
joining the attorney general from enforcing a statute 'would also automatically
bind any private party who might try to bring suit against them.'" Appx. 257 (quot-
ing *Whole Woman's Health*, 595 U.S. at 43) (ellipsis omitted). But that plainly is
not the argument that Plaintiffs in *this* case are making; indeed, it isn't even the ar-
gument that Plaintiffs made below:

> Plaintiffs in *this* case are not asking this Court to enjoin "the world at
> large," nor to enjoin "private parties by proxy," but simply to enjoin
> Defendants Anderson and Reyes from participating in "giving effect
> to" the Act. As *Whole Woman's Health* makes clear, any such injunc-
> tion would not preclude future private litigants from suing under the
> Act; but insofar as the resulting declaratory and injunctive relief either
> encourages Utah to legislate with a defter hand or discourages private
> parties from filing suit in the wake of persuasive authority from this
> Court, Plaintiffs will have accomplished their constitutionally legiti-
> mate goal.

Appx. 216 (citations omitted). Failing to understand Plaintiffs' argument, the dis-
trict court likewise failed to address it—ignoring the numerous cited occasions in
which the Supreme Court has conferred standing based on the anticipated reactions

of *nonparties* to a judgment *See* Appx. 207-08 (citing *Duke Power Co. v. Carolina Env't Study Grp., Inc*., 438 U.S. 59, 78 (1978); *Utah v. Evans*, 536 U.S. 452, 463 (2002); and *Dept. of Commerce v. New York*, 139 S. Ct. 2551 (2019)). *See also supra* p. 26-27 (discussing cases applying similar reasoning in the Tenth Circuit).

Finally, the district court failed to appreciate a critical difference between the instant case and *Whole Woman's Health.* Although the Supreme Court acknowledged that it "has never recognized an unqualified right to pre-enforcement review of constitutional claims in federal court," foundational to its reasoning was its acknowledgment that *some* forum was available for an aggrieved party to assert her constitutional rights. The *Whole Woman's Health* Majority accused dissenting Justice Sotomayor of "wildly mischaracteriz[ing] the impact of [the Court's] decision" by suggesting that it "somehow 'clears the way' for the 'nullification' of federal law." *Whole Woman's Health*, 595 U.S. at 49. After all, "any individual sued under S.B. 8 may pursue state and federal constitutional arguments in his or her defense," and "[i]f other States pass similar legislation, pre-enforcement challenges like the one the Court approves today [against medical licensing officials] may be available in federal court to test the constitutionality of those laws" and "further pre-enforcement challenges may be permissible in state court and federal law may be asserted as a defense in any enforcement action." *Id.* at 49-50.

But for the John Doe Plaintiff in this case, there *is* no other hypothetical time, place, suit, or forum in which to assert his rights. As a putative viewer rather than a commercial entity publishing "material harmful to minors" on the internet, he is not subject to an enforcement action under the Verification Act and therefore is not able to violate it in order to obtain a forum in which to assert his constitutional claims as defenses. This affirmative challenge is the only means by which he can act to vindicate his constitutional rights in *any* forum, at *any* time. The nullification of which Justice Sotomayor spoke might have been hypothetical to the Majority in *Whole Woman's Health*, but *here*, it is no mere specter. Nor will it be in future civil rights litigations, either:

> For some parties who rely on injunctions to vindicate their substantive rights, [] defense against an enforcement action is not even a theoretical alternative. Consider, for example, someone who is subjected to unconstitutional prayer in a public school, or who is denied welfare benefits or fired from a job for unconstitutional reasons, or even the plaintiffs in *Brown v. Board of Education*, who experienced racial segregation. Does the Constitution guarantee none of them rights to sue for injunctions or other remedies adequate to enforce their substantive rights?

Fallon, *supra* p. 2, at 1306.

Reading *Whole Woman's Health* as Defendants are likely to suggest will chill the exercise of First Amendment rights and inexorably shield countless laws from challenge by those affected by the administration and operation of the laws but not their prosecution by state officials. States—both red and blue—are liable to

continue shrouding their unconstitutional laws from judicial review.[15] And constitutional rights long taken for granted risk relegation to illusory promises subject to the caprices of stingy legislatures. Neither *Whole Woman's Health* nor any other binding precedent compels that unfortunate turn.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellants ask this Court to reverse the district court's dismissal and remand for an adjudication on the merits.

Respectfully Submitted,

Date: September 27, 2023                    By     */s/* Jeffrey Sandman

                                            _____

                                            Jeffrey Sandman
                                            Webb Daniel Friedlander LLP

                                            D. Gill Sperlein
                                            The Law Office of D. Gill Sperlein

                                            Jerome Mooney
                                            Weston, Garrou & Mooney

                                            Attorneys for Appellants

---

[15] *See, e.g.,* Cal. Bus. & Prof. Code §§ 22949.60-.71 and Cal. Civ. Proc. Code § 1021.11 (creating a private right of action against any person who manufactures, imports, or sells assault weapons within the state, with damages of at least $10,000 for each violation).

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellants submit that oral argument would assist the Court in determining when the nexus between a state official and a challenged statute is sufficient to confer standing upon plaintiffs and render that official a proper defendant under the exception to sovereign immunity carved out in *Ex Parte Young*. This Court appears to be one of the last appellate courts to evaluate its *Ex Parte Young* jurisprudence in the wake of the Supreme Court's decision in *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021). This case provides a prime opportunity to examine the impact of that precedent on litigants, like those here, harmed by the exercise (or threat thereof) of (1) a chief legal officer's general duties conferred under state law, and (2) an official's duties aiding in the *administration* of an unconstitutional state law but not its *prosecution*.

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Federal Rule of Appellate Procedure 32(A)

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 8,366 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirement of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

DATE: September 27, 2023

/s/ D. Gill Sperlein

_____

D. Gill Sperlein
The Law Office of D. Gill Sperlein
345 Grove Street
San Francisco, CA  94102
415-404-6615
gill@sperleinlaw.com

**ATTACHMENT - ORDERS ON APPEAL**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| FREE SPEECH COALITION, INC.; D.S. DAWSON; JOHN DOE; DEEP CONNECTION TECHNOLOGIES, INC.; CHARYN PFEUFFER; and JFF PUBLICATIONS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>JESS L. ANDERSON, in his official capacity as THE COMMISSIONER OF THE UTAH DEPARTMENT OF PUBLIC SAFETY; and SEAN D. REYES, in his official capacity as THE ATTORNEY GENERAL OF THE STATE OF UTAH,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS<br><br><br><br>Case No. 2:23-CV-287 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendants' Motion to Dismiss. For the reasons

discussed below, the Court will grant the Motion.

## I. BACKGROUND

In 2023, the Utah legislature passed a bill—S.B. 287—requiring commercial entities that

provide pornography and other materials defined as being harmful to minors to verify the age of

individuals accessing that material.[1] A commercial entity may be held liable if it "fails to

perform reasonable age verification methods to verify the age of an individual attempting to

access the material," and a commercial entity that is found to have violated the law "shall be

liable to an individual for damages resulting from a minor's accessing the material, including

---

[1] Utah Code Ann. §§ 78B–3–1001 to –1002.

1

court costs and reasonable attorney fees as ordered by the court."[2]

S.B. 287 identifies three reasonable age verification methods. Relevant here is the use of a "digitized information card." The Act defines "digitized identification card" as

> a data file available on any mobile device which has connectivity to the Internet through a state-approved application that allows the mobile device to download the data file from a state agency or an authorized agent of a state agency that contains all of the data elements visible on the face and back of a license or identification card and displays the current status of the license or identification card.[3]

Plaintiffs contend that S.B. 287 is unconstitutional and seek an order "enjoining the Commissioner of Utah's Department of Public Safety from permitting its data files to be downloaded for use" in the age verification process "and the Attorney General from otherwise intervening to enforce the Act."[4] Defendants seek dismissal.

## II. MOTION TO DISMISS STANDARD

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). Rule 12(b)(1) permits dismissal for lack of subject matter jurisdiction. When a facial attack of the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint, the Court applies the same standards as one made pursuant to Rule 12(b)(6).[5]

## III.  DISCUSSION

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the

---

[2] *Id.* § 78B–3–1002(1), (3).

[3] *Id.* § 78B–3–1001(2).

[4] Docket No. 2 ¶ 63.

[5] *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).

United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."
"[T]he Eleventh Amendment has been interpreted to bar a suit by a citizen against the citizen's
own State in Federal Court."[6] It also extends to "suit[s] against a state official in his or her
official capacity" because such suits are "no different from a suit against the State itself."[7]
However, under the *Ex parte Young* exception to Eleventh Amendment immunity, a plaintiff
may bring suit to prospectively enjoin state officials from violating federal law.[8]

To invoke this exception, the named state official "must have some connection with the
enforcement" of the challenged statute.[9] Otherwise, the suit "is merely making him a party as a
representative of the state, and thereby attempting to make the state a party."[10] The named
official is "not required to have a 'special connection' to the unconstitutional act or conduct.
Rather, state officials must have a particular duty to 'enforce' the statute in question and a
demonstrated willingness to exercise that duty."[11]

Plaintiffs' claims against the Utah Attorney General do not fall within the *Ex parte Young*
exception to the Eleventh Amendment. As Plaintiffs' Complaint acknowledges, "the Act creates
a private right of action by which Utah residents—and not state actors—are empowered to do the
State's bidding."[12] Plaintiffs point to the Attorney General's general duties to "prosecute or

---

[6] *Johns v. Stewart*, 57 F.3d 1544, 1552 (10th Cir. 1995) (internal quotation marks and
citation omitted).

[7] *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

[8] *Johns*, 57 F.3d at 1552.

[9] *Ex parte Young*, 209 U.S. 123, 157 (1908).

[10] *Id.*

[11] *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007).

[12] Docket No. 2 ¶ 63.

3

defend all causes to which the state or any officer, board, or commission of the state in an official capacity is a party, and take charge, as attorney, of all civil legal matters in which the state is interested" and to "give [their] opinion in writing and without fee."[13] However, the mere general duty to enforce the law is not sufficient to invoke *Ex parte Young*.[14]

Plaintiffs rely on a series of Tenth Circuit cases where the court found a sufficient connection between the authority of the attorney general and the enforcement of the relevant state laws to allow for the *Ex parte Young* exception. These cases not only predate recent Supreme Court authority on this issue, they are also distinguishable on the facts. In particular, Plaintiffs cite to *Petrella v. Brownback*[15] and *Chamber of Commerce of the United States of America v. Edmondson*.[16]

In *Petrella*, the Tenth Circuit found that the governor and attorney general of Kansas were both proper parties to a suit challenging the state's school-funding laws. In addressing the causation prong of the standing analysis, the court stated that "[i]t cannot seriously be disputed that the proper vehicle for challenging the constitutionality of a state statute, where only prospective, non-monetary relief is sought, is an action against the state officials responsible for

---

[13] Utah Code Ann. § 67-5-1(b), (g).

[14] *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021) (quoting 13 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 3524.3 (3d ed., Oct. 2020 update) ("[T]he duty must be more than a mere general duty to enforce the law.")); *see also Whole Woman's Health v. Jackson*, ---U.S.---, 142 S. Ct. 522, 534–35 (2021) (finding that the *Ex parte Young* exception did not apply where the attorney general did not possess any enforcement authority in connection with the law at issue).

[15] 697 F.3d 1285 (10th Cir. 2012).

[16] 594 F.3d 742 (10th Cir. 2010).

the enforcement of that statute."[17] It went on to state that it could not "be disputed that the Governor and Attorney General of the state of Kansas have responsibility for the enforcement of the laws of the state."[18]

  The Tenth Circuit has recently distinguished *Petrella* in finding that suit against a state attorney general was barred by the Eleventh Amendment. In *Hendrickson v. AFSCME Council 18*, the Tenth Circuit found that the governor and attorney general of New Mexico were immune from suit where the statute at issue vested enforcement authority in a board that was independent from the governor and attorney general. In discussing *Petrella*, the court noted that there was no indication that "the statutory provisions at issue fell outside the scope of [the attorney general's] enforcement powers."[19] But, since the statute in *Hendrickson* vested enforcement power in an independent body, the court found that the plaintiff's reliance on *Petrella* unavailing. The same result is warranted here. While the Attorney General has a number of general duties, S.B. 287 vests enforcement authority in private citizens, not the Attorney General. As such, the *Ex parte Young* exception does not apply and *Petrella* does not dictate a different result.

  In *Edmonson*, the Tenth Circuit addressed an Oklahoma statute that regulated "illegal immigration and verification of employment eligibility."[20] As to one provision of the statute, the court held that the attorney general was not protected by Eleventh Amendment immunity because it found that the attorney general had "a particular duty to enforce that section and a

---

[17] *Petrella*, 697 F.3d at 1293–94.

[18] *Id.* at 1294.

[19] *Hendrickson*, 992 F.3d at 968.

[20] *Edmonson*, 594 F.3d at 750.

5

demonstrated willingness to exercise that duty."[21] However, with respect to a different section of the statute, the court reached the opposite conclusion because the plaintiffs did "not cite to any Oklahoma law authorizing the Attorney General to enforce that provision."[22] Because the attorney general had no particular duty to enforce that provision, it fell "outside the scope of the *Ex parte Young* exception" and the attorney general was "entitled to immunity as to that challenge."[23] Thus, *Edmonson* does not support Plaintiffs' arguments.[24] Instead, *Edmonson* stands for the proposition that Eleventh Amendment immunity applies when the law at issue does not provide the attorney general with the power to enforce it.

In sum, Plaintiffs point only to the Attorney General's generalized responsibilities to enforce the laws of the state and provide written opinions to the legislature. Such general enforcement powers are not sufficient to establish the connection needed to invoke the *Ex parte Young* exception to Eleventh Amendment immunity. Plaintiffs have failed to demonstrate that the Attorney General has a particular duty to enforce S.B. 287 or that he has demonstrated a willingness to exercise that duty. Therefore, Plaintiffs' claims against the Utah Attorney General must be dismissed.

---

[21] *Id.* at 760 (citation omitted).

[22] *Id.*

[23] *Id.* (citing *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979) (merely because "an attorney general has a duty to prosecute all actions in which the state is interested [is not] enough to make him a proper defendant in every such action")).

[24] Plaintiffs' reliance on *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014), is also misplaced. There, the Tenth Circuit "conclude[d] that the Governor's and the Attorney General's actual exercise of supervisory power and their authority to compel compliance from county clerks and other officials provide[d] the requisite nexus between them and" the challenged law. *Id.* at 1204.

Turning to Plaintiffs' claims against Commissioner Anderson, they also fail to meet the *Ex parte Young* exception. Anderson is the Commissioner of the Utah Department of Public Safety. The Department includes the Driver License Division ("DLD"). The DLD manages Utah's Mobile Driver's License program ("mDL"), which provides an official copy of a user's driver's license or identification card to their mobile device.[25] Plaintiffs allege that the mDL program provides the only qualifying "digitized identification card," which is one of the three methods for reasonable age verification. It is this link between the mDL program and its use as a potential method for age verification that provides the basis for Plaintiffs' invocation of *Ex parte Young*. However, Plaintiffs admit that the mDL program "does not yet provide for the online verification necessary for the card to be of any use to putative providers and viewers of 'material harmful to minors' online."[26]

The Tenth Circuit has made clear that under the *Ex parte Young* exception, the state official must "have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty."[27] Commissioner Anderson has no ability to enforce S.B. 287. Rather, as Plaintiffs admit, that provision provides for a private right of action. Plaintiffs argue that the mDL program, as a potential method for age verification, will help give effect to S.B. 287.

The Tenth Circuit has applied the *Ex parte Young* exception where "[d]efendants, although not specifically empowered to ensure compliance with the statute at issue, clearly have

---

[25] Docket No. 2 ¶ 18.

[26] *Id.*

[27] *Hendrickson*, 992 F.3d at 965 (citation omitted).

7

assisted or currently assist in giving effect to the law."[28] For example, in *Wagnon*, the court applied the *Ex parte Young* exception where the defendants were all state officials who, in one way or another, had some connection with the statute at issue.[29] That is not the case here, where Commissioner Anderson's connection with S.B. 287 is only that he oversees the mDL program. Such a connection is simply too attenuated to provide the connection required by *Ex parte Young*.[30]

Further, as noted, the mDL program's online verification is not currently operative. Its functionality is currently limited to an in-person scan.[31] As such, it can hardly be said that Commissioner Anderson clearly has assisted or currently assists in giving S.B. 287 effect.

Even assuming that Commissioner Anderson's connections to the mDL program were sufficient to invoke the *Ex parte Young* exception, Plaintiffs claims against Commissioner Anderson are not ripe. Plaintiffs admit that the mDL program does not yet provide for online verification. Plaintiffs speculate that the entity that provides the digitized identification card "may or may not choose to do business with covered websites, and may or may [not] charge constitutionally permissible fees for use of its product."[32] Such speculative statements demonstrate that any claim against Commissioner Anderson, to the extent there could be one, is premature.

---

[28] *Wagnon*, 476 F.3d at 828 & n.15.

[29] *Id.* at 828.

[30] *Ex parte Young*, 209 U.S. at 157.

[31] Docket No. 32, at 3.

[32] Docket No. 2 ¶ 50.

Plaintiffs argue that Defendants are the equivalent of the licensing officials in *Whole Woman's Health* that the Supreme Court concluded fell within the scope of the *Ex parte Young* exception. However, the Court reached this conclusion because each of those individuals was "an executive licensing official who may or must take enforcement actions against the petitioners if they violate the terms of Texas's Health and Safety Code, including" the challenged law.[33] Because those defendants had the authority to enforce the challenged provision, this was sufficient to allow the suit to proceed against them.[34] Defendants here do not possess any similar enforcement authority. As such, they are more akin to the Texas attorney general in *Whole Woman's Health*, who did not fall within the *Ex parte Young* exception.[35]

Plaintiffs also suggest that "[r]elief from this Court would likewise redress Plaintiffs' injuries by discouraging putative litigants from wasting time suing under a statute promising illusory awards of unrecoverable damages."[36] The Supreme Court rejected a similar argument in *Whole Woman's Health*. There, the petitioners argued that enjoining the attorney general from enforcing a statute "would also automatically bind any private party who might try to bring . . . suit against them."[37] The Court noted that this theory suffered "from some obvious problems."[38]

---

[33] *Whole Woman's Health*, 142 S. Ct. at 535.

[34] *Id.* at 535–36.

[35] *Id.* at 534 ("While *Ex parte Young* authorizes federal courts to enjoin certain state officials from enforcing state laws, the petitioners do not direct this Court to any enforcement authority the attorney general possesses in connection with S. B. 8 that a federal court might enjoin him from exercising").

[36] Docket No. 32, at 14.

[37] *Whole Woman's Health*, 142 S. Ct. at 534.

[38] *Id.*

The Court explained that even "[s]upposing the attorney general did have some enforcement authority . . . , the petitioners have identified nothing that might allow a federal court to parlay that authority, or any defendant's enforcement authority, into an injunction against any and all unnamed private persons who might seek to bring their own . . . suits."[39] Therefore, the potential to ward off future suits is not sufficient.

The Court acknowledges Plaintiffs' concerns about the propriety of the legislature outsourcing the enforcement of laws that raise important constitutional questions. The wisdom of such policy decisions is best left to the other branches of government. It may be of little succor to Plaintiffs, but any commercial entity sued under S.B. 287 "may pursue state and federal constitutional arguments in his or her defense,"[40] they just cannot receive a pre-enforcement injunction against the two named Defendants.

### IV.  CONCLUSION

It is therefore

ORDERED that Defendants' Motion (Docket No. 29) is GRANTED. This action is dismissed without prejudice.

DATED this 1st day of August, 2023.

BY THE COURT:

_____
Ted Stewart
United States District Judge

---

[39] *Id.* at 535.

[40] *Id.* at 537.

10

AO 450 (Rev.5/85) Judgment in a Civil Case

# United States District Court

## District of Utah

FREE SPEECH COALITION, INC.; D.S.
DAWSON; JOHN DOE; DEEP
CONNECTION TECHNOLGIES, INC.;
CHARYN PFEUFFER; and JFF
PUBLICATIONS, LLC,

              Plaintiffs

              v.

JESS L. ANDERSON, in his official
capacity as THE COMMISSIONER OF
THE UTAH DEPARTMENT OF
PUBLIC SAFETY; and SEAN D.
REYES, in his official capacity as
THE ATTORNEY GENERAL OF THE
STATE OF UTAH,

              Defendants

**JUDGMENT IN A CIVIL CASE**

Case Number: 2:23-CV-287-TS

      IT IS ORDERED AND ADJUDGED

that this action is dismissed without prejudice.

August 1, 2023
_____
*Date*

BY THE COURT:

_____
Ted Stewart
United States District Judge

# ADDENDUM - S.B. 287

**Enrolled Copy**                                                 **S.B. 287**

## ONLINE PORNOGRAPHY VIEWING AGE REQUIREMENTS

### 2023 GENERAL SESSION STATE OF UTAH

### Chief Sponsor: Todd D. Weiler

### House Sponsor: Susan Pulsipher

LONG TITLE

**General Description:**

This bill creates obligations and liabilities for a commercial entity that provides pornography or other materials harmful to minors.

**Highlighted Provisions:**

This bill:

> ➢ provides definitions;

> ➢     requires a commercial entity that provides pornography and other materials defined as being harmful to minors as a substantial portion of the entity's content to verify the age of individuals accessing the material;

> ➢ establishes requirements and liability for retention of data;

> ➢     imposes liability for publishers and distributors of material harmful to minors who fail to comply with verification requirements; and

> ➢     provides that an Internet service provider or hosting entity is not liable for hosting or transmitting material harmful to minors to the extent that it is not the creator of the material.

**Money Appropriated in this Bill:**

> None

**Other Special Clauses:**

> None

**Utah Code Sections Affected:**

ENACTS:

> 78B-3-1001, Utah Code Annotated 1953

> 78B-3-1002, Utah Code Annotated 1953

*Be it enacted by the Legislature of the state of Utah*:

> Section 1. Section **78B-3-1001** is enacted to read:
> Part 10. Liability for Publishers and Distributors of Material Harmful to Minors

## <u>78B-3-1001</u>. Definitions.

<u>As used in this chapter:</u>

<u>(1) "Commercial entity" includes corporations, limited liability companies,</u>

<u>partnerships, limited partnerships, sole proprietorships, or other legally recognized</u>

<u>entities.</u>

<u>(2) "Digitized identification card" means a data file available on any mobile</u>

<u>device which has connectivity to the Internet through a state-approved application</u>

<u>that allows the mobile device to download the data file from a state agency or an</u>

<u>authorized agent of a state agency that contains all of the data elements visible on</u>

<u>the face and back of a license or identification card and displays the current status</u>

<u>of the license or identification card.</u>

(3) "Distribute" means to issue, sell, give, provide, deliver, transfer, transmute, circulate, or disseminate by any means.

(4) "Internet" means the international computer network of both federal and non-federal interoperable packet switched data networks.

(5) "Material harmful to minors" is defined as all of the following:

(a) any material that the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;

(b) material that exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated display or depiction of any of the following, in a manner patently offensive with respect to minors:

(i) pubic hair, anus, vulva, genitals, or nipple of the female breast;

(ii) touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or

(iii) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and

(c) the material taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

(6) "Minor" means any person under 18 years old.

(7) "News-gathering organization" means any of the following:

(a) an employee of a newspaper, news publication, or news source, printed or on an online or mobile platform, of current news and public interest, while operating as an employee as provided in this subsection, who can provide documentation of such employment with the newspaper, news publication, or news source; or

(b) an employee of a radio broadcast station, television broadcast station, cable television operator, or wire service while operating as an employee as provided in this subsection, who can provide documentation of such employment.

(8) "Publish" means to communicate or make information available to another person or entity on a publicly available Internet website.

(9) "Reasonable age verification methods" means verifying that the person seeking to access the material is 18 years old or older by using any of the following methods:

(a) use of a digitized information card as defined in this section;

(b) verification through an independent, third-party age verification service that compares the personal information entered by the individual who is seeking access to the material that is available from a commercially available database, or aggregate of databases, that is regularly used by government agencies and businesses for the purpose of age and identity verification; or

(c) any commercially reasonable method that relies on public or private transactional data to verify the age of the person attempting to access the material.

(10) "Substantial portion" means more than 33-1/3% of total material on a website, which meets the definition of "material harmful to minors" as defined in this section.

(11) (a) "Transactional data" means a sequence of information that documents an exchange, agreement, or transfer between an individual, commercial entity, or third party used for the purpose of satisfying a request or event.

(b) "Transactional data" includes records from mortgage, education, and employment entities.

Section 2. Section **78B-3-1002** is enacted to read:

**78B-3-1002. Liability for publishers and distributors -- Age verification -- Retention of data -- Exceptions.**

(1) A commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on the Internet from a website that contains a substantial portion of such material shall be held liable if the entity fails to perform reasonable age verification methods to verify the age of an individual attempting to access the material.

(2) A commercial entity or third party that performs the required age verification shall not retain any identifying information of the individual after access has been granted to the material.

(3) A commercial entity that is found to have violated this section shall be liable to an individual for damages resulting from a minor's accessing the material, including court costs and reasonable attorney fees as ordered by the court.

(4) A commercial entity that is found to have knowingly retained identifying information of the individual after access has been granted to the individual shall be liable to the individual for damages resulting from retaining the identifying information, including court costs and reasonable attorney fees as ordered by the court.

(5) This section shall not apply to any bona fide news or public interest broadcast, website video, report, or event and shall not be construed to affect the rights of a news-gathering organization.

(6) No Internet service provider, affiliate or subsidiary of an Internet service provider, search engine, or cloud service provider shall be held to have violated the provisions of this section solely for providing access or connection to or from a website or other information or content on the Internet, or a facility, system, or network not under that provider's control, including transmission, downloading, storing, or providing access, to the extent that such provider is not responsible for the creation of the content of the communication that constitutes material harmful to minors.