No. 23-4104

*In the*

# UNITED STATES COURT OF APPEALS

*for the*

# TENTH CIRCUIT

FREE SPEECH COALITION, INC.; D.S. DAWSON; JOHN DOE;
DEEP CONNECTION TECHNOLOGIES, INC.; CHARYN PFEUFFER; and
JFF PUBLICATIONS, LLC,

*Plaintiffs-Appellants,*

v.

JESS L. ANDERSON, in his official capacity as THE COMMISSIONER
OF THE UTAH DEPARTMENT OF PUBLIC SAFETY; and
SEAN D. REYES, in his official capacity as THE ATTORNEY GENERAL
OF THE STATE OF UTAH,

*Defendants-Appellees.*

Appeal from the United States District Court for the District of Utah
No. 2:23-cv-00287-District Judge Ted Stewart

**PLAINTIFFS-APPELLANTS' REPLY BRIEF
ORAL ARGUMENT REQUESTED**

| D. Gill Sperlein | Jerome Mooney | Jeffrey Keith Sandman |
|---|---|---|
| Law Offices of D. Gill Sperlein | Weston, Garrou & Mooney | Webb Daniel Friedlander LLP |
| 345 Grove Street | 50 West Broadway, #300 | 5208 Magazine St Ste 364 |
| San Francisco, CA  94102 | Salt Lake City, UT  84101 | New Orleans, LA  70115 |
| (415) 404-6616 | 801-364-5635 | (978) 886-0639 |
| gill@sperleinlaw.com | jerrym@mooneylaw.com | jeff.sandman@webbdaniel.law |

Attorneys for *Plaintiffs-Appellants*

I.  **Defendants Are Amenable To Suit Under *Ex Parte Young***

Defendants argue that **Commissioner Anderson** has no "connection to the enforcement of the Act" for three reasons: (1) the mDL Program that he is tasked with administering "is not the only method for performing the 'reasonable age verification' the Act requires"; (2) even if it were, "the Commissioner has no duty to provide an electronic identification card that can be used for remote age verification on the Internet"; and (3) even if he did, his administration of the mDL Program is simply too attenuated from Verification Act "enforcement" to meet the *Ex Parte Young* "connection" requirement.

The first argument buckles under any scrutiny. Where a statute imposes a content-based regulation on speech by siphoning disfavored categories through a few discrete preapproved channels, one of which is maintained by a state officer, it is no answer to the question of the officer's role in the enforcement that the statute also creates space for the private sector to maintain its own channels, too. Those who operate the private channels may do so without constitutional concern over content or viewpoint discrimination, the reasonableness of the fees they impose, and other First Amendment safeguards that govern the manner in which state actors, but not private businesses, are held to account.

Because content-based restrictions on speech so rarely survive constitutional scrutiny, this analysis of the third-party heckler's veto typically arises in cases

where content-*neutral* "time, place, and manner" regulation nevertheless risks content-*based* applications by private entities provided a role in the regulatory scheme.[1] One oft-recurring example concerns laws requiring would-be assemblers to obtain indemnity insurance before being permitted to picket in the public space—which courts, including this one, have roundly condemned for the lack of protection afforded the applicant. *See iMatter Utah v. Njord*, 774 F.3d 1258, 1267 (10th Cir. 2014) ("Even if ample alternatives for speech exist . . . the State cannot simply prohibit a group from speaking in a traditional public forum without demonstrating how the State's restriction on speech is narrowly tailored to serve a significant interest."); *see also E. Connecticut Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1056 (2d Cir. 1983) ("In denying an application for an insurance policy, brokers or underwriters often consider political beliefs of those who have applied for insurance coverage, the likelihood of adverse publicity to the insurance

---

[1] To be clear: The Verification Act is *not* subject to evaluation as a time, place or manner (T/P/M) restriction of speech in a public forum—an analysis reserved for content-*neutral* regulations. *See Brewer v. City of Albuquerque*, 18 F.4th 1205, 1220 (10th Cir. 2021) ("Content-based regulations of speech—*i.e.*, regulations based upon either the content or the subject matter of the speech—must meet strict scrutiny, whereas content-neutral regulations of speech—*i.e.*, regulations justified without reference to the content of the regulated speech—must meet intermediate scrutiny.") (internal quotation marks omitted). It is, however, worthy of note that even the test more deferential to the legislature demands "ample alternative channels for communication." *See, e.g., iMatter Utah v. Njord*, 774 F.3d 1258, 1263 (10th Cir. 2014) (laying out test for T/P/M restrictions).

company, the lack of business experience of the group, and other invidious or irrelevant factors. Consideration of such factors play a part in the decisions of an underwriter to reject insurance coverage applications."); *Collin v. Smith*, 578 F.2d 1197, 1209 (7th Cir. 1978) (noting that "the [insurance] requirement does not turn on the content of a proposed demonstration *except* in the sense that controversial groups will likely be unable to obtain insurance, as here") (emphasis added).

To the extent that Act-compliant age verification services even *exist* in the private sector—which existence is hotly challenged—those businesses are not prohibited by law from charging disfavored websites higher fees or refusing to do business with them altogether. This is a problem of the state's making, and one that—to its credit—it aimed to mitigate by subjecting one of the appointed "reasonable age verification methods" to constitutional oversight through its administration by state officials. But to deny that oversight is to place that administrator under no greater scrutiny than the private age verification vendors (whoever they are) who need not concern themselves with the Constitution.

The Commissioner's <u>second</u> argument fares no better. He admits that he oversees the Driver License Division (DLD), which established the mDL Program "per th[e] directive" of the Utah legislature. Response Brief at 14-15 (citing Utah Code § 53-3-235(1)(b) (hereafter, the "mDL Authorization Statute")). He argues, however, that absent a statutory command for the DLD to administer an mDL

3

program "with the functionality to verify over the internet," he cannot be in dereliction of duty for failing to provide it. Response Brief at 15-16. But it is simply wrong to assert that the Commissioner lacks a "connection to the enforcement" of the Verification Act simply because the mDL Authorization Statute does not specifically require the functionality that would lessen the constitutional harm wrought by the Verification Act. The mDL Authorization Statute *does require* the creation and implementation of a system for credentialing Utah drivers electronically, and the Verification Act *does require*, albeit implicitly, that the administrator of that electronic credentialling program provide something of *use* for the purpose ascribed to allay the constitutional harm.

    Consider the alternative, elucidated by analogy—(1) a statute creating a State Permit Office for receiving and processing various license and permit applications; (2) a second, later-passed statute that (i) subjects *only* environmental organizations to private tort liability for any nuisance caused by their assembling without a permit and (ii) authorizes applicants to seek assembly permits either from the State Permit Office or from one of several private permit expeditors (each operating pursuant to its own procedures and hefty fee schedules, and several of which will not do business with environmental groups); and, finally, (3) a State Permit Officer who refuses to process these assembly permits, in part because they are already available from private permit expeditors. Although the first statute

didn't specify that the State Permit Office must issue assembly permits in addition to other permits and licenses, implicit in the second ordinance is an expectation that environmental groups will have a sufficient opportunity to submit their applications and receive their permit to assemble. To test whether the First Amendment demands more of the State Permit Officer, is he not an appropriate defendant? Likewise here, to test whether the Constitution demands a functional state-run channel for speech to counter the restrictions imposed by state law, is the administrator of that singular state-run channel not an appropriate defendant either?

The Commissioner's <u>third</u> argument seeks to reduce the meaning of "enforcement" to something so narrow as to be unrecognizable in this Circuit. The district court recognized that this Court "has applied the *Ex parte Young* exception where '[d]efendants, although not specifically empowered to ensure compliance with the statute at issue, clearly have assisted or currently assist in giving effect to the law.'" MTD Order at 7-8 (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007)). Yet the district court, and now the Commissioner, give short shrift to what it means to "assist in giving effect to the law."

The Commissioner relies on a single Tenth Circuit case[2] to support his narrow interpretation. Response Brief at 19 (discussing *Peterson v. Martinez*, 707 F.3d 1197, 1207 (10th Cir. 2013)). But *Peterson* is leagues apart from this case for two reasons. First, the Public Safety Director's mere maintenance of a database cataloguing the states with which Colorado had reciprocal concealed handgun licensing (CHL) agreements was wholly incidental to the operation of the state's concealed carry law. That database was not alleged to provide constitutionally-required notice to the state's residents, nor to offer a mechanism by which to comply with the law, nor to serve any other function of constitutional significance. It was little more than "a convenient source for sheriffs seeking information relevant to [licensing] reciprocity," *id* at 1206, and not the critical piece of state-run technological infrastructure that provides the Verification Act its veneer of constitutionality. Second—and just as critically—the *Peterson* Court recognized that "when a

---

[2] The Commissioner also discusses an Eighth Circuit case to support his position. *See* Response Brief at 18 (discussing *Balogh v. Lombardi*, 816 F.3d 536 (8th Cir. 2016)). But this is not a case of first impression or a question tapping into limited sources of law, and it's entirely unclear why a single case of dubious analogy from a sister circuit should influence *this* Court. Anyway, subsequent panels of *that* court have stressed that it is not true that a suit against a state actor "may proceed only when it seeks to enjoin an 'enforcement action' [and that] so long as a state official is giving effect to a state statute in a manner that allegedly injures a plaintiff and violates his constitutional rights, an action to enjoin implementation of the statute or for declaratory relief is available against the state official." *McDaniel v. Precythe*, 897 F.3d 946, 952 (8th Cir. 2018).

state law explicitly empowers one set of officials to enforce its terms, a plaintiff cannot sue a different official absent some evidence that the defendant is connected to the enforcement of the challenged law."[3] *Id.* at 1207. Because "Colorado law require[d] sheriffs to enforce CHL reciprocity, not the executive director of the Department of Public Safety," that latter official was not an appropriate target for a lawsuit. *Id.* But here, *there is no other state official* expressly empowered by the Verification Act to enforce it. The rule articulated in *Peterson* merely focuses a constitutional challenge upon the appropriate state defendant; it does not work to deny plaintiffs their *only* available state defendant.[4]

---

[3] Other appellate courts provide similar analyses. *See, e.g., City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019) ("In conducting our *Ex parte Young* analysis, we first consider whether the plaintiff has named the proper defendant or defendants. Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends.").

[4] The Commissioner suggests that an adverse ruling could subject him to litigation "in any suit challenging a law that required identity or age verification of any kind and where a Utah driver's license was an appropriate form of identification." Response Brief at 20. In reality, his amenability to suit would be limited to those cases in which he is tasked with administering the only state-run conduit for constitutionally protected activity while failing to provide suitable means of compliance. Laws conditioning parade permitting, firearm licensure, or voter registration on proof-of-age submitted *online* via the mDL credential would, conceivably, render the Commissioner an appropriate defendant in a suit challenging the adequacy of the process. Laws requiring adults to prove their age before buying cigarettes from the convenience store most certainly would not.

Like the Commissioner, **Attorney General Reyes** bears the requisite connection to the enforcement of the Verification Act. The AG disparages *Petrella v. Brownback* as a case offering "no analysis and a bare citation" to an attorney general's duties under state law that were sufficient to provide the required connection to enforcement. *See* Response Brief at 22 (discussing *Petrella*, 697 F.3d 1285 (10th Cir. 2012)). But the work of distinguishing *Petrella*, which remains good law in this circuit, progressed no further than recognition that the statute at issue there "did not authorize a private cause of action, let alone *only* a private cause of action." *Id.* Defendants articulate a rule that when the legislature "vests enforcement authority in the hands of *either private parties* or other state officials, the attorney general has no duty to enforce the statute at issue and the *Ex parte Young* exception will not apply." *Id.* (emphasis added). But the rule fails spectacularly as a matter of logic, textual interpretation, and precedent: It's the principle just discussed in *Peterson* but stretched beyond its logical limit to preclude AG enforcement even *absent* the availability of another state officer. It reads a limitation into the AG's statutory duties that appears *nowhere* in the text of Utah Code § 67-5-1(1)(b). And the cases the Commissioner cites to support the rule never even acknowledge it, while other cases are plainly incompatible with it.

Chief among those is *Chamber of Com. of U.S. v. Edmondson*, for which the AG, try as he might, simply cannot articulate a principled distinction. *See* 594 F.3d

742 (10th Cir. 2010). As he acknowledges, this Court recognized the Oklahoma attorney general to be a proper *Ex Parte Young* defendant based on his statutory duty "to defend state agencies sued by their contractors." Response Brief at 28. But this wasn't pursuant to some esoteric statutory pronouncement unique to suits brought by contractors (as Defendants suggest); it came straight from the attorney general's general authority to "initiate or appear in any action in which the interests of the state or the people of the state are at issue." *See Edmondson*, 594 F.3d at 758 (quoting Okla. Stat. Ann. tit. 74, § 18b(A)(3)). If the language sounds familiar, that's because this is Oklahoma's version of *the same* statute that Plaintiffs invoke here, and which the district court utterly ignored. *See* Utah Code § 67-5-1(1)(b) ("The attorney general shall . . . prosecute or defend all causes to which the state or any officer, board, or commission of the state in an official capacity is a party, and take charge, as attorney, of all civil legal matters in which the state is interested[.]"). It is all but impossible to square *Edmonson* with the district court's holding below.[5]

## II.     Plaintiffs' Claims Are Justiciable.[6]

---

[5] The parties seem to agree that *Edmondson* could be the most useful precedent in this appeal; they differ only in how it should be read. *See* Response Brief at 27 ("Contrary to what FSC says, [*Edmondson*] supports the [AG's] position.").

[6] Although they don't explicit say so in their standing analysis, Defendants seem to acknowledge that standing and sovereign immunity blend into one inquiry focused on the Defendants' connection to the enforcement of the Verification Act. *See* Response Brief at 38-45.

Aside from *Whole Woman's Health v. Jackson*,[7] Defendants place the full weight of their standing arguments on *Nova Health Sys. v. Gandy*, a case that has been gutted of all import beyond its limited, fact-specific holding (but more on that later). *See* 416 F.3d 1149 (10th Cir. 2005). *Nova Health* involved a challenge to an Oklahoma law subjecting abortion providers to liability for any medical costs necessitated by an abortion performed without parental consent or knowledge—including costs born by subsequent medical providers. *Id.* at 1152-53. Plaintiff (an abortion provider) challenged the law by suing four public medical officials who were "not charged with enforcing [the statute] on Oklahoma's behalf" and were "simply able to bring a civil suit under that statute . . . in their proprietary capacities as directors of certain public medical institutions" that might one day have a reimbursement claim against the plaintiff. *Id.* at 1158. Plaintiff failed to show how these state medical administrators *caused* its injury, or how the effect of the judgment on the defendants would redress it. *Id.* at 1158-59.

*Nova Health* did not involve claims against the state's top legal officer, or the administrator of the state-run program at the heart of a statutory scheme, or indeed *any* state official with a unique enforcement role by virtue of her public office. The administrators of the public medical facilities in that case were no

---

[7] Plaintiffs addressed *Whole Woman's Health* in detail in their Principal Brief.

different than administrators of a *private* hospital facing the same theoretical right to reimbursement for hypothetical medical services performed in the future.

Other litigants have tried to read *Nova Health* as expansively as the Defendants do here. In *Consumer Data Indus. Ass'n v. King*, this Court left no doubt about how those arguments should fare:

> *Nova Health* is a fact-bound decision with little bearing on the merits of this case. It sheds no light on the doctrine of redressability beyond its narrow holding—a party lacks standing to seek an injunction against a nominally public defendant who has not threatened suit and who cannot be distinguished from the countless private litigants with identical enforcement powers. That holding does not apply here because the Attorney General does have special enforcement authority and can be distinguished from the garden-variety private litigant. . . .
>
> The State contends *Nova Health* ought to be applied beyond its facts, to any case where the relief sought does not completely redress a discrete injury. But *Nova Health* cannot bear the weight of such a broad interpretation, and even if it could, subsequent panels of this Court have not construed the decision so broadly. *See, e.g., Edmondson*, 594 F.3d at 773–74 (Hartz, J., concurring and dissenting) (reading *Nova Health* as stating the basic proposition that potential for relief must rise above speculative level); *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008) (same). . . .
>
> There are also several decades of Supreme Court precedent counseling against a broader reading of *Nova Health*. Under these precedents, redressability is satisfied when a favorable decision relieves *an* injury, not *every* injury. *See, e.g., Massachusetts v. EPA*, 549 U.S. at 526; *Larson*, 456 U.S. at 243 n. 15. . . . Indeed, if the law required that the requested relief afford complete redress, the Supreme Court would not have allowed Massachusetts to proceed against the EPA, as there was no guarantee a favorable decision would mitigate future environmental damage, much less redress it completely. Similarly, we would have dismissed the suit against the Attorney General in *Edmondson*, where

> the immediate and primary threat to the plaintiffs came from public employers, not the Attorney General. *See* 594 F.3d at 757.
>
> To recap, federal courts have consistently found a case or controversy in suits between state officials charged with enforcing a law and private parties potentially subject to enforcement. *Doe v. Bolton*, 410 U.S. 179, 188 (1973). So long as the plaintiff faces a credible threat of enforcement, redressability is generally not an obstacle, *see Edmondson*, 594 F.3d at 757, and **our decision in Nova Health does not carve out an exception in cases where the state defendant shares enforcement power with private litigants**. [Plaintiff] therefore had standing to sue the Attorney General for injunctive relief.

*King,* 678 F.3d 898, 904–06 (10th Cir. 2012) (bolded emphasis added).

Plaintiffs assert standing to pursue their claims for (1) injunctive relief against the Commissioner; (2) injunctive relief against the Attorney General; and (3) declaratory relief against either or both Defendants.

As for the first, the **Commissioner** is wrong when he asserts that *all* of Plaintiffs' constitutional injuries derive from an "inability to access material without engaging in any verification"—and he compounds the error when he insists that redressability is impossible where statutory age verification requirements will remain in effect "regardless of whether the Commissioner must provide a functional digitized information card." Response Brief at 40. Plaintiffs' injuries are *not* so limited and include the chill on speech wrought by the prior restraint imposed by the Act and, specifically, the role that the Commissioner plays in constraining

it.[8] *See* ROA 32-33 (Compl. ¶¶ 46-51). *That* discrete injury—though minor amidst the mass of others—will be redressed by an injunction removing the Commissioner from the equation.[9] The law requires no more. *See Edmondson*, 594 F.3d at 757.

But so, too, will Plaintiffs find reprieve from that mass of other harms, because the "digitized identification card" provision is so fundamental to the Verification Act as to be inseverable from the remainder. It's an argument that Defendants wholly ignore and that courts roundly accept: By knocking out one rotten leg indispensable to the integrity of the stool, a litigant can ensure that the entire thing collapses with it. *See* Principal Brief at 24-25.

The Commissioner's ripeness argument likewise misapprehends the harm here. *See* Response Brief at 41. Plaintiffs' claims were and remain ripe both because (1) the Commissioner has failed to provide a functional digitized identification card that would mitigate the ongoing constitutional injury, and (2) an

---

[8] This Court has routinely recognized that a chill on First Amendment activity may constitute a cognizable injury. *See, e.g., Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1183 (10th Cir. 2010) (finding standing where "Plaintiffs were chilled in the exercise of their First Amendment rights").

[9] The Commissioner accuses Plaintiffs of requesting forms of relief that have migrated from a negative injunction in the Complaint to a mandatory one in the Principal Brief. But Plaintiffs do not now seek, and never have sought, a mandatory injunction requiring the Commissioner to do anything at all; instead, they have identified the constitutional shortcomings of the state's mDL Program as it relates to the Verification Act and sought to enjoin his continued participation barring improvements to allay the discrete constitutional injury.

unconstrained prior restraint on speech ripens before those lacking constraints are abused, since it is the chill imposed on that speech that constitutes the harm. *See* Principal Brief at 28-29 & n.14; *see also Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1098 (10th Cir. 2006) (reasoning that legislative supermajority requirement for wildlife initiatives "by its very existence[] chills the exercise of the Plaintiffs' First Amendment rights" because the injury is not just "the defeat of a particular initiative, or even the greater difficulty faced by groups like the Plaintiffs who decide to mount an initiative campaign, but the dampening effect of the supermajority requirement on advocacy of a wildlife initiative"; because the plaintiffs' claim did "not depend on any uncertain, contingent future events, and the courts would gain nothing by allowing the issues in the case to develop further," that claim was ripe). So it is here, too.

    Plaintiffs' demand for an injunction running against the **Attorney General** likewise establishes the traceability and redressability required for standing. The AG again tries to distinguish *Edmondson* without articulating any meaningful differences between the cases and the general statutory powers providing the connection to enforcement (and thus standing) in either case. *Compare* Response Brief at 42 *with* Utah Code Ann. 67-5-1(1)(b). Even the statutory section in *Edmondson* that succumbed to the sovereign immunity defense *survived* the attorney general's arguments as to standing—which the Utah AG glibly attributes to a standing

decision that didn't take up the (manifestly significant) question of redressability in the challenge to that section of the statute.

Finally, the requested **declaratory relief** suffices to redress at least some of the constitutional injury here, too. Defendants dismiss as dicta this Court's recognition in *King* that declaratory relief against the attorney general, although not preclusive as to nonparties, would nonetheless benefit the plaintiff in "suits brought by consumers." *See* Response Brief at 45. They dismiss Tenth Circuit environmental cases just because they did not involve requests for declaratory relief in a challenge to a *statute*.[10] *See id.* at 45-46. And, to distinguish a trio of Supreme Court cases, Defendants simply assume that which they seek to prove—that *they*, unlike those Supreme Cout litigants, have "no connection to the enforcement" of the Verification Act. *See id.* at 47 n.11. But this, of course, is the million-dollar question in this appeal, and one that the Court should answer so as to halt the slide toward constitutional "rights" existing in name only.

---

[10] Defendants need look no further than *Edmondson* for application of this principle to a legal challenge to a *statute*. *See* 594 F.3d at 758 ("That some public employers outside the scope of the injunction might refuse to enter into contracts with businesses [whose practices are protected by the injunction] does not divest plaintiffs of standing. An opposite holding would contravene Supreme Court precedent so as to require complete redressability. In any event, 'we may assume it is substantially likely that other officials would abide by an authoritative interpretation of the provision even though they would not be directly bound by such a determination.'") (quoting *Utah v. Evans*, 536 U.S. at 460) (brackets and ellipses omitted from internal quotation).

# CERTIFICATE OF COMPLIANCE

# WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(A) and (B)(ii) because it contains 15 pages and 4844 words, including all headings and footnotes.

2. This brief complies with the typeface requirement of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

DATE: December 20, 2023

                                                                                    /s/ Jeffrey Keith Sandman
Jeffrey Keith Sandman
Webb Daniel Friedlander LLP
5208 Magazine St., Ste. 364
New Orleans, LA  70115
(978) 886-0639
jeff.sandman@webbdaniel.law